18-3193-cv
Danny Donohue, et al. v. Andrew M. Cuomo, et al.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2019

Argued: June 22, 2020    Decided: November 6, 2020

Docket No. 18-3193-cv

DANNY DONOHUE, AS PRESIDENT OF THE CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO, CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO, MILO BARLOW, ON BEHALF OF HIMSELF, ON BEHALF OF RETIREES OF THE STATE OF NEW YORK FORMERLY IN THE CSEA BARGAINING UNITS, THOMAS JEFFERSON, ON BEHALF OF HIMSELF, ON BEHALF OF RETIREES OF THE STATE OF NEW YORK FORMERLY IN THE CSEA BARGAINING UNITS, CORNELIUS KENNEDY, ON BEHALF OF HIMSELF, ON BEHALF OF RETIREES OF THE STATE OF NEW YORK FORMERLY IN THE CSEA BARGAINING UNITS, JUDY RICHARDS, ON BEHALF OF HERSELF, ON BEHALF OF RETIREES OF THE STATE OF NEW YORK FORMERLY IN THE CSEA BARGAINING UNITS, HENRY WAGONER, ON BEHALF OF HIMSELF, ON BEHALF OF RETIREES OF THE STATE OF NEW YORK FORMERLY IN THE CSEA BARGAINING UNITS,

*Plaintiffs-Appellants,*

— v. —

ANDREW M. CUOMO, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF NEW YORK, PATRICIA A. HITE, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS ACTING COMMISSIONER, NEW YORK STATE CIVIL SERVICE DEPARTMENT, CAROLINE W. AHL, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW YORK STATE CIVIL SERVICE COMMISSION, J. DENNIS HANRAHAN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW YORK STATE CIVIL SERVICE COMMISSION, ROBERT L.

MEGNA, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE NEW YORK STATE DIVISION OF THE BUDGET, THOMAS P. DiNAPOLI, IN HIS OFFICIAL CAPACITY AS COMPTROLLER OF THE STATE OF NEW YORK, JONATHAN LIPPMAN, IN HIS OFFICIAL CAPACITY AS CHIEF JUDGE OF THE NEW YORK STATE UNIFIED COURT SYSTEM,

*Defendants-Appellees,*

THE STATE OF NEW YORK, NEW YORK STATE CIVIL SERVICE DEPARTMENT, NEW YORK STATE AND LOCAL RETIREMENT SYSTEM, NEW YORK STATE UNIFIED COURT SYSTEM,

*Defendants.*

---

Before:

NEWMAN, HALL, and LYNCH, *Circuit Judges.*

---

Plaintiffs-Appellants the Civil Service Employees Association ("CSEA") and officers and retired former members of CSEA challenge the State of New York's 2011 reduction, through the amendment of a state statute and regulation, of its contribution rates to retired former state employees' health insurance premiums. Plaintiffs-Appellants contend that the reduced contribution rates contravene the State's contractual obligation, under CSEA's collective-bargaining agreements with the State, to pay a fixed percentage of retirees' health insurance premiums throughout their retirements. They bring claims for breach of contract under New York law and for impairing the obligations of contract in violation of the Contract Clause of the U.S. Constitution. We conclude that both of Plaintiffs' claims raise unresolved issues of state law that are appropriate for certification. We therefore reserve decision and certify two questions to the New York Court of Appeals.

2

ERIC E. WILKE, Of Counsel, Civil Service Employees Association, Inc., Albany, NY (Daren J. Rylewicz, Jennifer C. Zegarelli, *on the brief*), *for Plaintiffs-Appellants.*

FREDERICK A. BRODIE, Assistant Solicitor General of Counsel, Albany, NY (Letitia James, Attorney General, State of New York, Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General *on the brief*), *for Defendants-Appellees.*

GERARD E. LYNCH, *Circuit Judge*:

This case arises from the State of New York's 2011 reduction, through the amendment of a state statute and regulation, of its rate of contribution to certain retired former employees' health insurance premiums for the first time in almost twenty-nine years, from 90% to 88% for individual coverage and from 75% to 73% for dependent coverage. The Civil Service Employees Association ("CSEA"), the union representing the largest bargaining unit of employees of New York State ("the State"), joined by certain officers and retired former members of CSEA, brought suit on behalf of themselves and retired former members of that bargaining unit. They contend that the State's reduction of its contribution rate contravenes its contractual obligations, under CSEA's past collective-bargaining

agreements ("CBAs") with the State, to pay a fixed percentage of retirees' health insurance premiums throughout their retirements. They seek relief for breach of contract under New York State law and for impairment of the obligations of contract in violation of the Contract Clause of the United States Constitution.

In order to prevail on either claim, Plaintiffs must establish that the relevant CBAs provide for a vested right to health-insurance coverage at fixed contribution rates for the life of the retiree. It is beyond dispute that the CBAs do not *expressly* provide for a vested right to coverage at fixed contribution rates. As a result, Plaintiffs' suggested interpretation of the CBAs is tenable only if a vested right – or, at minimum, ambiguity with respect to such a right, as is necessary for the consideration of extrinsic evidence of the meaning of the CBAs – may be inferred under the circumstances. Moreover, even if Plaintiffs can establish that the State's reduction of its contribution rates to retiree health-insurance premiums breached a contractual obligation, the resolution of both of their claims depends on whether the State, in reducing its contribution rates, merely breached its contract, permitting a remedy for breach under state law, or completely negated any such obligation so as to preclude plaintiffs from recovering damages under state law. Both of these issues depend on aspects of New York law on

4

which the State's courts have not conclusively ruled and that meet our other criteria for certification. We therefore reserve decision and certify two questions to the New York Court of Appeals.

**BACKGROUND**

In 1956, the State established the New York State Health Insurance Plan ("NYSHIP"), an optional health-benefit plan for active and retired State employees. Since the inception of NYSHIP, the State has contributed to both active employees' and retirees' NYSHIP premium costs. Prior to 1983, the State, pursuant to a State statute, paid 100% of both employees' and retirees' costs for individual coverage and 75% of their costs for dependent coverage. In 1982, the State and the unions representing State employees negotiated a reduction of the State's contribution rate for individual coverage from 100% to 90%, effective January 1, 1983. Among the unions with which the State negotiated was CSEA, which represents the largest bargaining unit of State employees. Members of that bargaining unit include employees of the Administrative Services Unit, Operational Services Unit, Institutional Services Unit, Division of Military & Naval Affairs Unit, and some employees of the Unified Court System.

CSEA's and the State's memorandum of understanding, which they entered into in November 1982, provided that the State would pay 90% of the cost of premium charges "for the coverage of State employees" and 75% of the cost of premium charges "for the coverage of dependents of such State employees." J. App'x 1450. It did not expressly address the State's contribution rates for retirees or define the term "employee[]." The State legislature thereafter amended New York Civil Service Law § 167 to codify the negotiated contribution rates. As amended in 1983, Civil Service Law § 167(1) provided, in part, that:

> The full cost of premium or subscription charges for the coverage of retired state employees who are enrolled in the basic, statewide health insurance plan established pursuant to this article and who retired prior to [January 1, 1983] shall be paid by the state. Nine-tenths of the cost of premium or subscription charges for the coverage of state employees and retired state employees retiring on or after [January 1, 1983] who are enrolled in such basic, statewide health insurance plan shall be paid by the state. . . . [T]hree-quarters of the cost of premium or subscription charges for the coverage of dependents of such state employees and retired state employees shall be paid by the state.

N.Y. Civ. Serv. Law § 167(1), eff. 1983. The substance of this portion of the statute has remained largely unchanged to this day. *See id*. § 167(1). Between 1982 and 2011, CSEA and the State entered into eight successive collective-bargaining

6

agreements. Beginning in 1985, each of these agreements provided, in identical or substantially similar language, that "[t]he State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage" under NYSHIP. J. App'x 918; *see also id*. at 943, 966, 993-94, 1013-14, 1034, 1051.[1] These provisions did not specify the *duration* of the State's agreement to contribute at these rates. Each of the eight agreements also provided, in identical or substantially similar language, that "[e]mployees covered by [NYSHIP] have the right to retain health insurance after retirement upon completion of ten years of service." *Id*. at 923; see also *id*. at 946, 972, 997, 1018, 1038, 1055, 1069. Each of the eight CBAs contained a duration clause, specifying the term of the CBA itself to be either three or four years, depending on the CBA. *See* J. App'x 931, 949, 980, 1004, 1026, 1044, 1061, 1074.

Between January 1, 1983 and September 30, 2011, the State contributed to the NYSHIP premium costs of eligible retired former State employees who had retired on or after January 1, 1983 at the rates of 90% (for individual coverage)

---

[1] The parties' 1982-1985 CBA, which was in effect when the parties negotiated the reduction of the State's contribution rate to individual coverage from 100% to 90%, provided that the State would continue to pay 100% of individual coverage and 75 % of dependent coverage subject to negotiated rate changes. *See* J. App'x 1066-67, 1070.

and 75% (for dependent coverage).

Beginning in December 2007, the United States economy (as well as other economies around the world) was plagued by a severe financial crisis that has become known as the "Great Recession." In the wake of that crisis, the State faced significant budget deficits for fiscal years 2009-2010, 2010-2011, and 2011-2012. In 2011, the State attempted to close its $10 billion budget gap for fiscal year 2011-2012 through a variety of cost-reducing measures, including a $1.5 billion cut to state agency operations. The State budgeted for $450 million of that operational reduction to come from workforce-related reductions and asked all state agencies to submit proposals for such reductions. The Department of Civil Service proposed, among other contemplated reductions, a reduction to the State's contribution rates to NYSHIP premiums.

In June 2011, CSEA and the State agreed to the terms of a five-year CBA, covering 2011-2016. Under the negotiated agreement, the State reduced its rates of contribution to the NYSHIP premium costs of employees represented by CSEA, with two sets of rates based on employees' salary grades. According to the CBA, "[e]ffective October 1, 2011 for employees in a title Salary Grade 9 or below or an employee equated to a position title Salary Grade 9 or below . . . the State

8

agrees to pay 88 percent of the cost of individual coverage and 73 percent of the cost of dependent coverage," and "for employees in a title Grade Salary 10 or above . . . the State agrees to pay 84 percent of the cost of individual coverage and 69 percent of the cost of dependent coverage." *Id.* at 865.

Leaders of both the State and CSEA acknowledged in public statements that the parties' agreement had allowed the State to reduce its labor costs without the need for widespread layoffs. Governor Andrew M. Cuomo called the CBA "a win-win for CSEA members and the State of New York" that, "if adopted by the other bargaining units, means layoffs needed to achieve needed workforce savings would be avoided." *Id.* at 854. CSEA President Danny Donohue referred to the agreement as a product of "shared sacrifice" that was responsive to "CSEA's concerns about job security." *Id.* The State and unions representing other bargaining units subsequently agreed to terms for successor CBAs that reflected the same reductions in the State's contribution rates to employees' NYSHIP premiums.

On August 17, 2011 the State legislature amended Civil Service Law § 167(8), which had previously provided that the State's contribution rates to eligible employees' NYSHIP coverage costs could be "increased" subject to the

9

terms of a CBA, without any mention of modifications other than increases. *See* Sp. App'x 6. As amended, § 167(8) provided that, "[n]otwithstanding any inconsistent provision of law, where and to the extent that an agreement between the state and an employee organization . . . so provides, the state cost of premium or subscription charges for eligible employees covered by such agreement may be *modified* pursuant to the terms of such agreement." N.Y. Civ. Serv. Law § 167(8) (emphasis added). The amended statute further provided that the President of the Civil Service Commission, with approval from the Director of the Budget, "may extend the modified state cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision." *Id.*[2]

Thereafter, pursuant to the terms of § 167(8), the Acting Commissioner of the Department of Civil Service sought and received approval from the State's Budget Director to extend the modified contribution rates, as defined in the State's CBAs with CSEA and other bargaining units, to retirees. The Department

---

[2] The State legislature did not amend § 167(1), which continues to provide that 90% of individual coverage costs and 75% of dependent coverage costs "of state employees and retired state employees retiring on or after" January 1, 1983 "shall be paid by the state." N.Y. Civ. Serv. Law § 167(1).

of Civil Service implemented that extension of the modified rates by amending its regulations. As amended, Title 4, § 73.3(b) of the New York Code of Rules and Regulations provided that "for retirees who retired on or after January 1, 1983, and employees retiring prior to January 1, 2012, New York State shall contribute 88 percent of the charge on account of individual coverage and 73 percent of the charge on account of dependent coverage." N.Y. Comp. Codes R. & Regs. tit. 4, § 73.3(b).[3]

The State estimates that the reduction of its rates of contribution to retirees' NYSHIP coverage costs saved the State approximately $30 million annually and that the premiums for retirees who retired between January 1, 1983 and December 31, 2011 would increase by approximately $10.50 per month for individual coverage and $28.50 per month for dependent coverage.

Following the State's reduction of its contribution rates for retirees' NYSHIP coverage costs, retired former State employees, the unions that had

---

[3] The amended regulation also provided that the State would contribute to the coverage costs of retirees who retired on or after January 1, 2012 at the same rates at which it contributed to their coverage prior to retirement, based on salary grade: 88% (individual coverage) and 73% (dependent coverage) for retirees whose title had been Salary Grade 9 or below, and 84% (individual coverage) and 69% (dependent coverage) for retirees whose title had been Salary Grade 10 or above. *See* N.Y. Comp. Codes R. & Regs. tit. 4, § 73.3(b).

represented them, and those unions' officers brought suit in federal court, in eleven separate actions. The CSEA plaintiffs filed the instant action on December 28, 2011. The United States District Court for the Northern District of New York (Mae A. D'Agostino, *J.*) designated CSEA's action as the lead case. Following discovery, Defendants moved for summary judgment in all eleven actions. The CSEA plaintiffs moved for summary judgment in this action. The district court granted Defendants' motions in all eleven actions, concluding, *inter alia*, that the CBAs unambiguously did not provide for the vesting of the State's agreement to pay 90% of retirees' individual coverage costs and 75% of their dependent coverage costs under NYSHIP. The district court denied Plaintiffs' cross-motion for summary judgment.

This appeal – along with ten others, by plaintiffs in the related cases – followed.

## DISCUSSION

Plaintiffs contend that each of the eight successive CBAs between CSEA and the State in effect between 1982 and 2011 gave retiring employees a vested right to retain NYSHIP coverage with the State contributing 90% of the cost of individual coverage and 75% of the cost of dependent coverage. If, as plaintiffs

allege, such an obligation exists under the agreements, the State plainly violated that obligation by reducing its contribution rates for retirees' coverage. The State does not dispute that it unilaterally reduced its contribution rates for CSEA members who retired between 1983 and 2011; rather, it maintains that it acted within its legal rights by doing so.

Plaintiffs bring two claims arising from their theory that the CBAs provide for a vested right to coverage at a fixed contribution rate. First, they argue that the State breached the CBAs in violation of New York contract law.[4] Second, they argue that the State impaired its contractual obligation, in violation of the Contract Clause of the U.S. Constitution.

As explained below, we find that resolving Plaintiffs' claims requires that we apply New York law at two junctures in our analysis of both the state contract-law and federal constitutional claims. First, Plaintiffs cannot prevail on either claim unless we interpret the CBAs to provide for a vested right to

---

[4] The parties place primary emphasis on Plaintiffs' federal constitutional claim, perhaps because it is that claim that gives the federal courts jurisdiction over this action and allows for the exercise of supplemental jurisdiction over Plaintiffs' state-law claim. *See* 28 U.S.C. §§ 1331, 1367(a). However, because (as discussed below) the issues raised by Plaintiffs' state-law claim are logically prior to those raised by their federal constitutional claim, we address their state-law claim first.

13

NYSHIP coverage at fixed contribution rates for retirees – either because they unambiguously so provide, or because they are ambiguous as to such a right and extrinsic evidence resolves that ambiguity in Plaintiffs' favor.[5] In order to reach such a conclusion, we would need to infer the existence of a vested right, or ambiguity with respect to the existence of such a right, notwithstanding that the CBAs do not provide for such vesting in explicit terms. That analysis begins – and, in the case of Plaintiffs' state-law breach-of-contract claim, ends – with the application of state-law principles of contractual interpretation.

Second, if we conclude that the CBAs do provide for a vested right to NYSHIP coverage at fixed contribution rates, we must consider what remedy is available to Plaintiffs in light of the State's failure to comply with its alleged contractual obligation. Plaintiffs can prevail on their breach-of-contract claim only if a state-law remedy is available to them, meaning that the State's reduction of its contribution levels to retirees' premiums breached but did not invalidate its

---

[5] Plaintiffs seek to establish the asserted contractual obligation solely on the theory that each now-expired CBA in effect between 1983 and 2011 conferred on employees who retired during the term of that CBA a vested right to continued NYSHIP coverage at the existing contribution rates throughout their retirements. As they clarified at oral argument, Plaintiffs do not contend that the 2011-2016 CBA provided any rights to specific contribution rates to already-retired former members of the bargaining unit.

14

contractual obligation. Conversely, Plaintiffs' federal constitutional claim for contractual impairment is tenable only if the State has impaired, rather than merely breached, its obligation by negating any remedy under state law. *See TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344, 349 (2d Cir. 2000). The task of determining the existence of a state-law remedy for breach of contract requires that we consider and apply state law.

At both of these junctures, New York law does not provide settled principles that we may apply in order to conclusively resolve the issues in this case. The New York Court of Appeals has previously declined to either adopt or reject an inference that retirees' health benefits vest under CBAs in the absence of express vesting language, but it has suggested that CBAs may be ambiguous with respect to the vesting of such benefits under certain circumstances. *See Kolbe v. Tibbetts*, 22 N.Y.3d 344, 354-55 (2013). In addition, the question whether the New York legislature, by amending Civil Service Law § 167(8) to permit the extension of modified contribution rates (as negotiated by the State and unions representing State employees) to retirees, and the New York Civil Service Commission, by promulgating amended regulations that reduced the State's contribution rates to retirees' NYSHIP coverage, thereby invalidated any contrary

15

contractual obligations under the State's CBAs (as opposed to merely breaching those obligations) is one that, in our view, is both novel and uniquely suited to the judgment of the State's judiciary. Therefore, and for the reasons explained below, we certify two questions to the New York Court of Appeals and reserve decision on this case.[6]

## I.  Standard of Review

"We review a district court's decision granting summary judgment *de novo*,

---

[6] We also reserve decision in the other ten cases on appeal, which were brought by other unions and their retired former members, and which were briefed and argued in tandem with this appeal: *Kreh v. Cuomo* (18-3220-cv); *Spence v. Cuomo* (18-3140-cv); *New York State Law Enforcement Officers Union Council 82 v. Hite* (18-3142-cv); *New York State Correctional Officers and Police Benevolent Association v. Cuomo* (18-3151-cv); *New York State Police Investigators Association v. Cuomo* (18-3066-cv); *Police Benevolent Association of New York State v. Cuomo* (18-3183-cv); *Police Benevolent Association of New York State Troopers v. Cuomo* (18-3049-cv); *Roberts v. State of New York* (18-3172-cv); *New York State Court Officers Association v. Hite* (18-3221-cv); and *Brown v. Cuomo* (18-3122-cv; 18-3166-cv; 18-3345-cv). Although each of these cases raises different issues turning in part on the different terms of CBAs entered by different groups of State employees, the instant case – as suggested by the fact that it has been treated throughout this litigation as the lead case – presents questions the resolution of which will significantly advance, if not control, the dispositions of the other cases. We therefore think it prudent to certify questions to the New York Court of Appeals in this case, rather than to burden that Court with a host of variations on the most significant theme common to all of the cases. We expect that once those questions are resolved, the principles of state law determined in this case will enable us to resolve the issues in the remaining cases without further resort to certification.

16

and will affirm only if the record, viewed in the light most favorable to the non-movant, shows no genuine dispute of material fact and demonstrates the movant's entitlement to judgment as a matter of law." *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019) (internal quotation marks omitted). We also review issues of contractual interpretation *de novo*. *Id*.

## II. Determination of Applicable Law

The relationship between Plaintiffs' state-law and federal constitutional claims, and between the roles of state and federal law in resolving those claims, is somewhat complicated. We therefore begin our analysis by clarifying that relationship and identifying the legal authorities that we apply to each of these claims.

Both Plaintiffs' claim for contractual impairment, in violation of the Contract Clause, and their claim for breach of contract, in violation of New York law, rest initially on a single, disputed premise: that CSEA's CBAs with the State between 1982 and 2011 guaranteed to employees upon their retirement a vested right to retain health-insurance coverage at the specific contribution rates set forth in those agreements. Thus, our first task in resolving both claims is one of contractual interpretation.

Under both federal law and New York law, "[w]e interpret collective-bargaining agreements . . . according to ordinary principles of contract law." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *see Kolbe*, 22 N.Y.3d at 353 ("[W]e must look to well established principles of contract interpretation to determine whether the parties intended that the contract give rise to a vested right."). The National Labor Relations Act ("NLRA") guarantees to employees "the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively" and prohibits employers from refusing to bargain collectively with its employees' representatives. 29 U.S.C. §§ 157, 158(a)(5). The Labor Management Relations Act ("LMRA") "grants federal courts jurisdiction to resolve disputes between employers and labor unions about collective-bargaining agreements," *Tackett*, 574 U.S. at 434. *See* 29 U.S.C. § 185(c). It also "ensures that federal law will be the basis for interpreting collective-bargaining agreements." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S . 246, 262 (1994) (internal quotation marks omitted). But the protections of the NLRA are available to private-sector workers, not to state employees. *See* 29 U.S.C. § 152(2). New York State employees' right to bargain collectively is provided for solely by New York law. *See* N.Y. Civ. Serv. Law § 203. The CBAs between CSEA and the State are

18

therefore contracts created under and governed by New York law.

"Contract law is a general area of law[] traditionally regulated by the states." *Geweke Ford v. St. Joseph's Omni Preferred Care Inc.*, 130 F.3d 1355, 1359 (9th Cir. 1997); *see also Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 293 (3d Cir. 2001), abrogated on other grounds by *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 n.5 (2008) ("Contract law is mostly state law, and it varies from state to state.") While principles of contractual interpretation are often consistent between states (and, when a contract is governed by federal law, between state and federal law), state courts and legislatures retain the authority to diverge from traditional contract-law principles. Federal courts, when applying state law, are bound to apply the law as established by the state's highest court. "State autonomy and the relationship between state and federal authority would be impaired were the federal courts to set state policy independently and follow their own instincts as to state contract law." *Pineman v. Oechslin*, 637 F.2d 601, 606 (2d Cir. 1981).

In analyzing Plaintiffs' breach-of-contract claim, which alleges that Defendants violated state contract law by breaching the terms of CBAs executed under New York law, we are therefore obligated to apply New York law. The

19

parties discuss two recent decisions of the Supreme Court of the United States interpreting private-sector CBAs under federal law with respect to the vesting of retiree health benefits, *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) and *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761 (2018). But those decisions are not controlling insofar as we apply New York law to interpreting the CBAs here. However much respect we, and the New York courts, accord to pronouncements of the United States Supreme Court as highly persuasive authority, its interpretations of CBAs created under the authority of the NLRA are neither based on New York law nor binding on New York courts, when such courts interpret CBAs created under the authority of New York statutes in accordance with New York's understanding of contract law principles. In applying New York law to Plaintiffs' breach-of-contract claim, we are similarly obliged to regard the Supreme Court's decisions in *Tackett* and *Reese* as persuasive rather than binding authority.

In evaluating Plaintiffs' federal constitutional claim for contractual impairment, "the existence of the contract and the nature and extent of its obligation become federal questions for the purposes of determining whether they are within the scope and meaning of the Federal Constitution, and for such

purposes finality cannot be accorded to the views of a state court." *Irving Trust Co. v. Day*, 314 U.S. 556, 561 (1942). Because the Contract Clause protects only those contractual obligations recognized as such by the federal Constitution, "in order that the constitutional mandate may not become a dead letter, we are bound to decide for ourselves whether a contract was made [and] what are its terms and conditions." *State of Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100 (1938). In this way, states may not "evade the restraint of the [Contract] Clause by determining, through legislation or adjudication, that an arrangement previously regarded as a contract was no longer enforceable." *Pineman*, 637 F.2d at 604. Nor may they generate federal constitutional protections for purported or actual obligations by conferring contractual status on arrangements that are "not, in any sense, a contract within the meaning of the Constitution of the United States." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 437 (8th Cir. 2007) (internal quotation marks omitted).

The Contract Clause does not, however, constitutionalize all questions of contract law or prohibit states from developing the law of contracts according to their own lights. In analyzing a claim brought under the Contract Clause, "we accord respectful consideration and great weight to the views of the state's

highest court," and our inquiry necessarily "involves an appraisal of the statutes of the State and the decisions of its courts." *Brand*, 303 U.S. at 100. When the "construction and effect" of a contract "is a state question," the federal courts "must determine it from the law of the state" but "give our own judgment derived from" state law. *Appleby v. City of New York*, 271 U.S. 364, 380 (1926). This Court has therefore noted that the question of whether an alleged contractual obligation exists "is an issue of both state and federal law" and that "[i]nitially it is a question of state law, for only those arrangements enforceable as contractual obligations under state law are protected by the Contract Clause against impairment." *Pineman*, 637 F.2d at 604.

Thus, our initial inquiry into the meaning of the CBAs for the purpose of evaluating Plaintiffs' impairment claim is for the most part coextensive with our interpretation of the CBAs for the purpose of evaluating Plaintiffs' state-law breach claim. In both cases, we begin by applying state law to determine whether the CBAs contain the alleged contractual obligation. Even in the event that state law endorses interpretive principles that are distinct from those under federal law, we may nonetheless apply those state-law principles in evaluating Plaintiffs' Contract Clause claim, so long as we independently determine the contract's

22

meaning and do not accord finality to state law, and so long as state law neither recognizes nor denies contractual status in a manner precluded by the Constitution.

If we interpret the CBAs to give rise to the alleged obligation, however, our analysis of Plaintiffs' two claims then necessarily diverges. Impairing a contract is not the same thing as breaching it; in fact, liability for impairment and liability for breach are mutually exclusive. "A contract creates alternative obligations. Either perform the contract or pay damages." *TM Park Ave.*, 214 F.3d at 349. The distinction between a contractual breach and a contractual impairment "depends on the availability of a remedy in damages." *E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page Cty., Ill.*, 613 F.2d 675, 679 (7th Cir. 1980). If a state, by legislative action, breaches a contract's terms, it may nevertheless fulfill its contractual obligation by paying damages; in such cases, it has not impaired the obligations of contract within the meaning of the Constitution. If, however, the state's legislative action not only *breaches* the contract but also purports to *invalidate* the obligation, so as to preclude a damages remedy at state law, the state's action constitutes an impairment (which may or may not violate the Contract Clause, based on considerations discussed below).

"[T]he federal Circuit Courts, as well as the Supreme Court, have consistently viewed this distinction – between breach and the removal of any remedy for a breach – as a line delineating whether a Contracts Clause claim may lie." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 63 (2d Cir. 2020). Under the circumstances of this case, it is also a line delineating whether a state-law claim for breach of contract may lie. In order to prevail on their state-law claim, then, Plaintiffs must establish the existence of a fact (the availability of a state remedy for breach) that precludes them from prevailing on their federal constitutional claim, and vice versa. Thus, these two grounds for relief may exist only in the alternative.

Whether or not Plaintiffs may recover damages on their breach-of-contract claim is fundamentally a question of state law; the related question, essential to the Contract Clause analysis, of "whether the State has, by later legislation, impaired its obligation" is ultimately a federal question that "we are bound to decide for ourselves." *Brand*, 303 U.S. at 100. But here, as with our analysis of the CBAs' meaning, New York law – in this case, pertaining to the effect of state legislative action on the State's obligation to pay damages arising from contractual obligations violated by such action – will be a critical factor in our

24

resolution of the impairment issue.

"It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions," including by "render[ing] decisions on federal constitutional questions unnecessary by resolving cases on the basis of state law." *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-50 (2d Cir. 2001). Because our resolution of Plaintiffs' breach-of-contract claim may foreclose Plaintiffs' ability to prevail on their Contract Clause claim, we address the state-law claim first.

## III. Breach of Contract

Under New York law, an action for breach of contract requires that a plaintiff establish "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). The first two elements are not at issue here. Defendants do not dispute that CSEA's CBAs with the State, under which the alleged obligation to pay fixed contribution rates arose, were valid and enforceable agreements. Nor do they suggest that Plaintiffs' state-law claim fails due to inadequate performance by CSEA or its members. We therefore limit our analysis to the remaining two elements: breach and damages.

### A. Breach of Contractual Obligation

The crux of Defendants' argument is that Plaintiffs "cannot establish the violation of any contractual right." Appellee's Br. at 37. Because the parties agree that the State reduced its contribution rates to the relevant retirees' NYSHIP costs, from 90% to 88% for individual coverage and 75% to 73% for dependent coverage, the issue of breach hinges on whether that reduction violated any contrary obligation under the CBAs. Thus, Plaintiffs' ability to establish breach requires that they prove that the CBAs gave retirees[7] a vested right to NYSHIP coverage to which the State contributed at fixed rates of 90% and 75%.

Because the task of determining whether the CBAs provide a vested right to coverage at fixed contribution rates requires us to apply New York law, we begin our analysis with an overview of the relevant precedents regarding whether and when it is appropriate to infer that retirees' health benefits vest under a CBA.

### 1. Legal Background

"As a general rule, contractual rights and obligations do not survive beyond the termination of a collective bargaining agreement. . . . However,

---

[7] Here and throughout the remainder of this opinion, the term "retirees" refers specifically to former state employees who retired between January 1, 1983 and December 31, 2011.

'rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement[,]' . . . and we must look to well established principles of contract interpretation to determine whether the parties intended that the contract give rise to a vested right." *Kolbe*, 22 N.Y.3d at 353 (citing and quoting *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 207 (1991)).

In *Kolbe*, the New York Court of Appeals considered whether retired former members of CSEA had a vested right, pursuant to CSEA's CBAs with the Newfane Central School District, to receive the same health insurance coverage until age 70 as was provided to them at the time of their retirement, and, if so, whether such a vested right encompassed a right to fixed prescription drug co-pays. *See* 22 N.Y.3d at 348-49. The CBAs stated that "[r]etired employees shall be eligible to continue group health insurance upon payment of [the] premium." *Id*. at 350 (internal quotation marks omitted). In a separate provision, the CBAs provided that retirees "shall be entitled to receive credit toward group health insurance premiums . . . for accumulated sick leave," to be paid by the school district "until the employee reaches age 70." *Id*. (internal quotation marks omitted). The same provision indicated that "[t]he coverage provided shall be the

coverage which is in effect for the unit at such time as the employee retires." *Id*. (internal quotation marks omitted).

The New York Court of Appeals concluded that "the plain meaning of this provision unambiguously establishes that plaintiffs have a vested right to the coverage which was in effect for the unit at such time as they retired, until they reach age 70," notwithstanding that no provision of the CBAs explicitly stated that coverage would continue beyond their dates of expiration. *Id*. at 353 (internal quotation marks and alterations omitted). It found that the placement of the sentence stating that "[t]he coverage provided shall be the coverage which is in effect for the unit at such time as the employee retires" within the same provision that set forth retirees' right to use accumulated sick-leave credit to reduce premiums "until the employee reaches age 70" permitted a "clear inference . . . that the parties intended the right to continued coverage to operate for the same period as the section as a whole, i.e., until the employee reaches 70," and that its "close proximity to this durational language is also evidence of an intent that it should vest upon retirement rather than terminate with the expiration of the CBA." *Id*.

Because the New York Court of Appeals found that the CBAs

28

unambiguously established a vested right to continued coverage until age 70, it declined "to rule on whether New York applies an inference of vesting for retiree health insurance rights." *Id*. at 354. It then considered whether the unambiguous vested right encompassed a right to fixed prescription drug co-pays. The CBAs set forth co-pay amounts that ranged from $0 to $5, without specific durational language regarding those costs. *See id*. at 349. The defendants argued that a vested right to the "same coverage" in retirement referred merely to "equivalent coverage" that "d[id] not substantially alter the overall package" of health insurance, and did not entitle retirees to fixed costs. *Id*. at 355 (emphasis omitted). The plaintiffs argued that they were entitled to fixed benefits and costs, because "once employees retire, they are no longer represented by the union in collective bargaining negotiations, . . . and, as a result, it is logical to assume that the bargaining unit intended to insulate retirees from losing important insurance rights during subsequent negotiations by using language in each and every contract which fixed their rights to coverage as of the time they retired." *Id*. at 354-55 (internal citation and quotation marks omitted). The New York Court of Appeals concluded that both parties "advanced . . . plausible interpretations of the operative provision," with respect to the scope of the vested right to coverage,

29

thereby "making it appropriate for the Court to consider extrinsic evidence" as to whether the parties intended co-pay amounts to vest. *Id*. at 355. It therefore remanded the case for further factual development of the parties' intent. *Id*. at 355-56.

In defining the inference that it declined either to adopt or reject, the Court referenced the Sixth Circuit's decision in *International Union, United Auto., Aerospace, & Agric. Implement Workers of Am. [UAW] v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). *See id*. at 354. In that case, the Sixth Circuit – applying the federal common law that governs the interpretation of CBAs negotiated under the NLRA and enforced under LMRA, *see Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 456-58 (1957) – held that courts should infer that CBAs providing health insurance benefits for retirees established vested rights. The Sixth Circuit reasoned that because "[b]enefits for retirees are only permissive not mandatory subjects of collective bargaining[,] . . . it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard-Man*, 716 F.2d at 1482. The so-called "*Yard-Man* inference" was repeatedly applied in federal cases, especially by the Sixth Circuit,

30

over the following three decades.[8]

In 2015, however, just over one year after the New York Court of Appeals decided *Kolbe*, the United States Supreme Court unanimously rejected the pro-vesting inferences articulated in Sixth Circuit precedents such as *Yard-Man*. In *M & G Polymers USA, LLC v. Tackett*, the Court considered claims brought under the LMRA and the Employee Retirement Income Security Act ("ERISA"), arising from a private employer's alleged promise of vested health insurance benefits to retirees under its CBAs. 574 U.S. at 431-32. The Court held that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id*. at 442. It found that inferences in favor of vested retirement benefits, where a CBA does not "provide in explicit terms that certain benefits continue after the agreement's expiration," were "inconsistent with ordinary principles of contract law," such as "the traditional principle that courts should not construe ambiguous writings to create lifetime promises" and "the traditional principle that contractual obligations will cease, in

---

[8] *See, e.g., Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1074 (6th Cir. 2008); *Noe v. PolyOne Corp.*, 520 F.3d 548, 555 (6th Cir. 2008); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1297 (6th Cir. 1991); *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 615 (6th Cir. 1985).

the ordinary course, upon termination of the bargaining agreement." *Id*. at 441-42 (internal quotation marks and alteration omitted).

Three years later, in *CNH Industrial N.V. v. Reese*, the Supreme Court clarified and extended its holding in *Tackett*. In *Reese*, the Court rejected the premise that, in light of *Tackett*, "the same *Yard-Man* inferences [the Sixth Circuit] once used to presume lifetime vesting can now be used to render a collective-bargaining agreement ambiguous as a matter of law, thus allowing courts to consult extrinsic evidence about lifetime vesting." 138 S. Ct. at 763. Rather, the Court suggested, "[w]hen a collective-bargaining agreement is merely silent on the question of vesting," courts should "conclude that it does *not* vest benefits for life." *Id*. at 766. "Similarly, when an agreement does not specify a duration for health care benefits in particular," courts should "simply apply the general durational clause." *Id*. The Court clarified that it had rejected the *Yard-Man* inferences in *Tackett* "not because of the *consequences* . . . attached to them – presuming vesting versus finding ambiguity – but because they are not a valid way to read a contract." *Id*. Those inferences, it explained, "cannot be used to create a reasonable interpretation any more than they can be used to create a presumptive one." *Id*.

32

The New York Court of Appeals has not had occasion to address the effect of *Tackett* and *Reese*, if any, on the circumstances in which New York law recognizes vested retiree health benefits under New York public-sector CBAs. *Kolbe*, the most relevant decision from the New York Court of Appeals on this subject, both predates and is at least arguably in tension with those Supreme Court precedents.[9] In *Kolbe*, the court inferred the existence of a vested right to retirement health benefits, despite the absence of express durational language to

---

[9] The State suggested at oral argument that New York law is fundamentally consistent with *Tackett* and *Reese*, citing both *Kolbe* and *Matter of Aeneas McDonald Police Benevolent Association v. City of Geneva*, 92 N.Y.2d 326 (1998). In *Aeneas McDonald*, the New York Court of Appeals declined to find that a contractual right vested on the basis of past practice, reasoning that extrinsic evidence is "merely an interpretive tool" to be employed when a contract is ambiguous, and that it "cannot be used to create a contractual right independent of some express source in the underlying agreement." 92 N.Y.2d at 333. While *Aeneas McDonald* stands for the proposition that contractual rights – including vested rights – must have a textual basis, it does not speak to what kinds of inferences may and may not be applied in locating contractual rights in a contract's text. The New York Court of Appeals in *Kolbe* presumably did not understand *Aeneas McDonald* to foreclose the possibility that New York law might apply inferences of vesting to retiree health benefits, given its indication that the status of such inferences under New York law was an open question. 22 N.Y.3d at 354. Thus, *Aeneas McDonald* does not command the conclusion that the holdings of *Tackett* and *Reese* reflect established principles of New York law. Nor does the fact that both the Supreme Court and the New York Court of Appeals have held that CBAs should be interpreted according to traditional contract principles dictate that the New York courts will follow *Tackett* and *Reese*. As noted above, different jurisdictions may and sometimes do interpret those principles differently.

33

that effect, based largely on the "close proximity" between the CBA's description of retiree coverage and durational language regarding the use of sick-leave credits. 22 N.Y.3d at 353. It also credited as "plausible" the plaintiffs' argument that the scope of the vested right included fixed co-pays based on an inference drawn from the collective-bargaining context, and found the CBAs ambiguous as to scope on that basis. *Id*. at 355-56. These two inferences, while not necessarily irreconcilable with *Tackett* and *Reese*, suggest some willingness to find that benefits vest even absent express durational language specific to those benefits. And, as discussed below, Plaintiffs here make arguments based on the particular language of the CBAs at issue in this case that bears at least a superficial resemblance to the language the New York Court of Appeals relied on to find vesting and ambiguity in *Kolbe*.

More recently, two state appellate divisions have taken divergent approaches to applying the Supreme Court's holdings in *Tackett* and *Reese*. In *Village of Old Brookville v. Village of Muttontown*, the Second Department considered whether the Village of Muttontown was obligated, under a CBA, to contribute to retired police officers' health benefit costs after the CBA's expiration. 117 N.Y.S.3d 264, 267 (2d Dep't 2020). Citing *Tackett* for the principle

that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life," *id*. (citing *Tackett*, 574 U.S. at 442), the court concluded that "the health care benefits at issue do not survive beyond the expiration of the [relevant] CBA," *id*. at 268. It distinguished *Kolbe* on the ground that, unlike in that case, the relevant CBA contained "no comparable language guaranteeing the same level of benefits beyond [its] expiration." *Id*.

In *Evans v. Deposit Central School District*, the Third Department considered whether the defendant school district had a vested obligation to pay the full cost of retired teachers' health insurance coverage, notwithstanding that the relevant CBA "d[id] not specify the duration that retired employees will receive benefits." 123 N.Y.S.3d 285, 289 (3d Dep't 2020). The court quoted from *Tackett* the proposition that "when a contract is silent as to the duration of retiree benefits, a court may not infer" lifetime vesting.[10] *Id*. at 288 (internal quotation marks

---

[10] However, the Third Department cited only *Old Brookville* as the source of this language, and used an "internal . . . citation omitted" parenthetical rather than citing *Tackett* (the omitted internal citation) by name. *See* 123 N.Y.S.3d at 288 (quoting *Old Brookville*, 117 N.Y.S.3d at 267); *see also Tackett*, 574 U.S. at 442. Neither did the court cite *Reese*, or indeed any federal cases, in its analysis of New York law applicable to New York public-sector CBAs.

omitted). But unlike the Second Department in *Old Brookville*, the Third Department concluded that, in the absence of specific durational language addressed to the particular provision, the CBA was *ambiguous* as to whether retirees' health benefits survived the CBA's termination. *Id.* at 289. It therefore considered the extrinsic evidence and found that evidence sufficiently strong to affirm a summary judgment resolving the textual ambiguity in favor of a vested right. *Id.* at 289-90.

While the courts in both *Old Brookville* and *Evans* purported to apply the central holding of *Tackett*, the Second Department in *Old Brookville* did so in a manner that was also consistent with *Reese*, whereas the Third Department in *Evans* did not. *See Reese*, 138 S. Ct. at 766 (holding that the inferences rejected in *Tackett* "cannot be used to create a reasonable interpretation any more than they can be used to create a presumptive one"). In light of these divergent approaches by New York appellate courts, we are not able to confidently predict, as Defendants ask us to do, that the New York Court of Appeals would necessarily adopt the holdings of *Tackett* and *Reese* under the circumstances of this case.

## 2. CBAs Between CSEA and the State

The provisions of the CBAs between CSEA and the State that set forth the State's contribution rates toward employees' NYSHIP coverage do not expressly specify the duration of that obligation. In the 2007-2011 agreement,[11] § 9.13(a) provides: "The State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse components provided under the Empire Plan." J. App'x 918. Section 9.13(b) provides that the State agrees to pay the same rates toward employees' "alternative Health Maintenance Organization (HMO) coverage." *Id*.

While § 9.13 does not specify the duration of the State's agreement to pay 90% of individual coverage costs and 75% of dependent coverage costs, Plaintiffs argue that a court could plausibly infer from the text of the 2007-2011 CBA that the parties intended that obligation to vest by reading that provision in combination with four others:

---

[11] For purposes of simplicity, we focus our discussion on the text of the parties' 2007-2011 CBA. The seven CBAs that directly preceded the 2007-2011 agreement, dating back to 1982, contain provisions that are identical or substantially similar to the provisions from the 2007-2011 CBA discussed herein, though the relevant provisions are not numbered consistently throughout the CBAs.

- § 9.23(a) of the 2007-2011 CBA, which provides that "[t]he unremarried spouse and otherwise eligible dependent children of an employee, who retires after April 1, 1979, with ten or more years of active State service and subsequently dies, shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage." *Id*. at 923.

- § 9.24(a) of the 2007-2011 CBA, which provides that "[e]mployees covered by the State Health Insurance Plan have the right to retain health insurance after retirement upon completion of ten years of service." *Id*.

- § 9.24(b) of the 2007-2011 CBA, which provides that "[a]n employee who is eligible to continue health insurance coverage upon retirement is entitled to a sick leave credit to be used to defray any employee contribution toward the cost of the premium" and allows employees to apply specified percentages "of the calculated basic monthly value of the credit towards defraying the required contribution to the monthly premium during their own lifetime." *Id*. at 923-24.

- § 9.25 of the 2007-2011 CBA, which provides that "[a]n employee retiring from State service may delay commencement or suspend his/her retiree health coverage and the use of the employee's sick leave conversion credits indefinitely." *Id*. at 924.

Section 9.24(a), which gives retirees a "right to retain" coverage, can plausibly be read as providing for either a non-vested right to retain NYSHIP coverage after retirement until the expiration of the CBA or a vested right to retain NYSHIP coverage throughout the retiree's lifetime. Under federal common

38

law as explicated in *Tackett* and *Reese*, the absence of any express indication that the right to retain coverage after retirement extends beyond the term of the CBA would seem to foreclose the possibility of vesting. The New York Court of Appeals, reviewing the divergent decisions in the Appellate Divisions, might look to *Tackett* and *Reese* for non-binding guidance, find *Kolbe* to be distinguishable on the basis of differences in the relevant CBA language, and decline – as the Second Department did in *Old Brookville* – to infer the existence of vested rights absent clear durational language. *See Old Brookville*, 117 N.Y.S.3d at 267.

Alternatively, a court following in *Kolbe*'s analytical footsteps might conclude that, in the context of surrounding provisions that seem to contemplate retirees' and their dependents' long-term retention of NYSHIP coverage, a "right to retain coverage after retirement" is properly understood as a vested right. In that case, *Kolbe* suggests that it is "plausible" that the scope of a vested right to coverage would encompass a right to fixed costs such as co-pays or, perhaps, contribution rates. 22 N.Y.3d at 355. Thus, a court applying *Kolbe* might find that the 2007-2011 CBA is ambiguous as to whether the scope of the theoretically vested "right to retain coverage after retirement" in § 9.24(a) includes a vested

right to the fixed contribution rates set forth in § 9.13.[12]

Section 9.23(a), which addresses the coverage of deceased retirees' surviving dependents, signals the parties' intent to negotiate post-retirement contribution rates for, at a minimum, a specific subset of retirees' dependents. The clause guarantees nothing to *living* retirees or their dependents, but it does seem to contemplate that such persons have NYSHIP coverage prior to retirees' deaths by bestowing on surviving dependents a right to "continue" coverage. J.

---

[12] The State does not dispute, for purposes of this litigation, that the CBAs may provide for a vested right to coverage, see Appellees' Br. 13, and so the question whether it does is not before us. Nevertheless, the question whether the CBAs provide for a vested right to coverage at all is closely related to the question at issue here: whether such a vested right encompasses fixed contribution rates. A necessary premise for Plaintiffs' interpretation is that at least the promise of continued coverage is a vested right. Notwithstanding the State's limited concession to this premise, if the CBAs, when properly interpreted under New York law, do not provide for *any* vested right to coverage, irrespective of the scope of such right, Plaintiffs cannot prevail on their claim. By contrast, if the CBAs are properly interpreted to provide for vested coverage rights, *Kolbe* suggests, under arguably analogous circumstances, that the textual bases for implying a vested right of coverage may also create an ambiguity with respect to the scope of such rights, including such matters as co-pays and premium contributions. Plaintiffs in this case (and/or plaintiffs in parallel cases) rely on the provisions of the CBAs under discussion as part of their argument that aspects of the text of the CBAs imply, or at least create an ambiguity, with respect to the vesting of the contribution rates. We therefore address their arguments concerning whether the CBAs' provisions suggest a vested right to coverage in service of our inquiry into whether they provide for a vested right to coverage at fixed rates of contribution.

App'x 923. Moreover, by guaranteeing that surviving dependents will pay contribution rates equal to those paid by active employees, the provision either seems to assume that living retirees and their dependents also have a contractual right to specific contribution rates, or else it confers on surviving dependents a contractual right not extended to living retirees and their dependents. (In the latter scenario, it is possible under the CBA that a deceased retiree's surviving spouse could pay a lower percentage of his NYSHIP costs than a living retiree pays of hers.) It would be odd, though not impossible, for CSEA to negotiate a fixed contribution rate for deceased retirees' surviving dependents but not for living retirees. Therefore, this provision arguably lends indirect support to the inference that the parties intended to fix contribution rates for retirees' coverage.[13]

---

[13] To be sure, § 9.23 does not expressly give deceased retirees' surviving dependents a *vested* right to continued coverage at the same contribution rates as active employees. It might therefore be read to apply only to surviving dependents of those retirees who retired (and subsequently died) during the term of the CBA, and to guarantee coverage to surviving dependents only until the CBA's expiration. But this interpretation is arguably undercut by the language of the provision, which states that it applies to the eligible surviving dependents of "an employee, who retires after April 1, 1979, with ten or more years of active State service and subsequently dies," not to surviving dependents only of those employees who both retire and die during the term of the agreement. *See* J. App'x 923.

Sections 9.24(b) and 9.25, concerning retirees' use of sick-leave credits to defray NYSHIP coverage costs, appear to contemplate that retirees may make contributions to NYSHIP coverage "during their own lifetime," and permit them to delay the application of such credits "indefinitely." *Id*. at 924. This durational language suggests that retirees may apply sick-leave credit toward their NYSHIP coverage costs beyond the expiration of the CBA, and therefore seems to assume that retirees will retain coverage beyond the CBA's term. As in *Kolbe*, the CBA's sick-leave-credit language appears to contemplate a duration for that benefit that is different from the term of the CBA. And, as in *Kolbe*, the CBA's promise of a right to post-retirement coverage appears within the same provision as the description of the sick-leave-credit benefit. *See* 22 N.Y.3d at 353. A court applying *Kolbe* might therefore impute the durational language accompanying the sick-leave-credit clause to the right to retain coverage after retirement, as the New York Court of Appeals did in light of the clauses' "close proximity" to one another. *Id*.

Taken together, these provisions promise NYSHIP coverage to retirees, allow retirees to use their accumulated sick leave to defray coverage costs "during their own lifetime" (or to postpone the use of such credits

42

"indefinitely"), and guarantee a fixed contribution rate to deceased retirees' surviving dependents. A court applying New York law might reasonably conclude, as in *Kolbe*, that these provisions suggest that retirees have a right to NYSHIP coverage not only until the expiration of the CBA, but for the rest of their lives. If a court reached such a conclusion, it might further conclude, as in *Kolbe*, that one "plausible interpretation[]" of a CBA that provides retirees with a vested right to health-insurance coverage is that the parties, mindful of the fact that employees lose their collective-bargaining rights upon retirement, intended the scope of the vested coverage right to include fixed or controlled costs. *Id*. at 355. We therefore think it is plausible that a court applying New York law might interpret the 2007-2011 CBA to be ambiguous on the question of whether the State's fixed contribution rates to NYSHIP coverage vest.

While we regard the Plaintiffs' textual arguments as plausible in light of the willingness of the New York Court of Appeals to infer vesting from the context of related CBA provisions, we do not regard those arguments as sufficiently compelling to predict that the New York Court of Appeals would endorse them. It might reasonably find that the various contractual provisions on which Plaintiffs rely do not indicate an intention *sub silentio* to vest a lifetime

43

right not just to participate in NYSHIP but to particular rates of State contributions to the cost of such participation.[14] It might therefore conclude that because § 9.13 of the 2007-2011 CBA is silent as to the duration of the State's agreement to pay 90% of individual coverage costs and 75% of dependent coverage costs, that agreement merely established a non-vested right that terminated upon the CBA's expiration.

In our view, the 2007-2011 CBA, as well as the seven CBAs that directly preceded it, is amenable to either of these interpretations, depending on whether New York law adopts the holdings of both *Tackett* and *Reese* (as in *Old Brookville*), adopts that of *Tackett* but not *Reese* (as in *Evans*), rejects both Supreme Court holdings and adopts the *Yard-Man* inference, or distinguishes the Supreme Court's holdings by finding adequate indications in the text of the CBAs to grant vested rights to contribution rates in light of the New York Court of Appeals'

---

[14] We note, in this regard, that the *Kolbe* Court distinguished the intention to vest a lifetime right in retirees to retain health insurance benefits, which it found the CBAs there unambiguously (if inexplicitly) granted, from the intention to vest a particular financial benefit of such insurance, in the form of co-pays, on which it found the CBAs ambiguous and remanded for consideration of extrinsic evidence. The issue in this case concerns the latter sort of question; reasonable courts might differ over whether the level of employer contributions to premium costs is more or less difficult to establish inferentially than the level of co-pays at issue in *Kolbe*.

44

prior decision in *Kolbe*. For that reason, we cannot say with certainty whether Plaintiffs can establish that the State breached the CBAs by proving the existence of the State's alleged contractual obligation to pay 90% of retirees' individual coverage costs and 75% of retirees' dependent coverage costs throughout retirees' lifetimes.

**B. Availability of Damages**

Assuming, without deciding, that Plaintiffs can successfully establish that the CBAs provide for a vested right to fixed contribution rates, thereby allowing them to establish the element of breach (or at least that the terms of the CBAs are sufficiently ambiguous to defeat Defendants' motion for summary judgment and require a trial to consider extrinsic evidence of the contract's meaning), to prevail on a breach-of-contract claim Plaintiffs must also establish that they are entitled to recover damages. *See Fischer & Mandell*, 632 F.3d at 799. "It is well settled that in breach of contract actions the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192 (2008) (internal quotation marks and citation omitted). However, this case presents an unusual potential obstacle to Plaintiffs' ability to recover damages: the

possibility, as contemplated by Plaintiffs' constitutional impairment claim, that in reducing its contribution levels to retirees' NYSHIP premiums by statute and regulation, the State not only breached but also *invalidated* its obligation under the CBAs, thereby precluding a remedy for damages.

"An individual breach of contract does not reach constitutional dimensions and create a cause of action based on the [C]ontracts [C]lause. The state, like any private party, must be able to breach contracts without turning every breach into a violation of the federal Constitution. Thus, it is necessary to distinguish between legislative action that merely breaches the contract and legislative action that impairs it." *TM Park Ave.*, 214 F.3d at 348-49 (internal quotation marks, citations, and alterations omitted). As noted above, the distinction between a contractual breach and a contractual impairment "depends on the availability of a remedy in damages in response to the state's" legislative action. *E & E Hauling*, 613 F.2d at 679.

If a state "passes a law and through enforcement of it prevents a[] party from fulfilling its obligation under the contract because the use of the ordinance precludes a damage remedy, the non-breaching party cannot be made whole. Instead, the law has impaired the obligation of the contract." *Id*. A state's "[u]se

46

of law normally will preclude a remedy of damages because the law will be a defense to a suit seeking damages unless it is clear the law is not to have that effect." *Id*.

Thus, in *E & E Hauling* the Seventh Circuit found that the defendant district "used its legislative authority to prevent the plaintiff from fulfilling its contract," and thereby precluded a damages remedy, when it not only enacted an ordinance that interfered with the plaintiff's contractual right to operate a landfill, but also "enforced the ordinance by placing armed guards at the landfill site." *Id*. at 680. This Court has found that a state defendant's legislative enactment of a wage freeze "not only . . . breach[ed] a previously made employment contract to which a state entity is a party, but . . . use[d] the state's powers to *invalidate* portions of those contracts, thereby negating any state law breach of contract remedy." *Nassau Cty.*, 959 F.3d at 63 (emphasis in original). On the other hand, courts have found that when a state defendant has made "no attempt . . . to use the law, federal or state, to repudiate a contractual obligation," the defendants remain "open to a suit for breach of contract." *Jackson Sawmill Co., Inc. v. United States*, 580 F.2d 302, 312 (8th Cir. 1978).

Plaintiffs can prevail on their breach-of-contract claim only if we conclude

that neither the New York legislature, in amending Civil Service Law § 167(8), nor the Civil Service Commission, in amending § 73.3(b) of the New York Code of Rules and Regulations, invalidated any contractual obligation of the State to pay 90% of retirees' individual NYSHIP coverage and 75% of retirees' dependent NYSHIP coverage throughout their retirements. Neither the statute nor the regulation, as amended, expressly repudiates all contrary contractual obligations; nor do they expressly preclude the State from paying damages or retirees from recovering them in the event that the reduced contribution rates violate the State's obligations under its CBAs. Thus, it is possible that the State believed that it was entitled under the terms of the CBAs to implement the reduction and did not contemplate the possibility that it was breaching any of its contractual obligations by doing so. If the State's breach arises from a good-faith misunderstanding of its CBAs' terms, rather than from a deliberate effort to impair its own obligation, state law might permit a remedy for its breach.

But the absence of language in the operative statute or regulation expressly repudiating the State's contractual obligations does not, in our view, conclusively establish that the State's actions lack any such repudiatory effect. Indeed, the amended statute provides that the reduction of contribution rates toward

48

NYSHIP coverage paid by the State may be applied "[n]otwithstanding any inconsistent provision of law." N.Y. Civ. Serv. Law § 167(8). That language most obviously contemplates the contrary specification of contribution rates in § 167(1), but it could plausibly be read to also refer to "any inconsistent" CBA provisions. Arguably the State has, by reducing its contribution rates to retirees' NYSHIP costs to the levels specified in § 73.3(b) of the regulations, "enforced" the regulation and "used its legislative authority to prevent the plaintiff[s] from fulfilling" the CBA's alleged terms. *E & E Hauling*, 613 F.2d at 680.

We are not aware of any decisions by New York courts that address whether, under circumstances like these, the State owes damages on its contractual obligations notwithstanding that such obligations were breached by a state legislative enactment. It is therefore not clear to us, from the face of the statute and regulation, whether under state law the reduction of the State's contribution rates to retirees' premiums constitutes a remediable breach or an irremediable repudiation of contrary obligations provided for in the State's CBAs.

\* \* \* \* \*

The task of resolving Plaintiffs' state-law claim for breach of contract, a

49

claim that is governed by New York law, is made difficult in this case by the uncertain status of New York law on two critical issues: (1) the applicable interpretive principles for determining whether a CBA provides for vested health benefits for retirees and, if so, defining the scope of such benefits; and (2) the effect of state legislative action that violates terms of the State's own CBAs on the availability of state-law damages. For the reasons explained below, we therefore reserve decision on Plaintiffs' breach-of-contract claim pending certification of these issues to the New York Court of Appeals.[15]

---

[15] It could be argued that Plaintiffs' state-law claim for breach of contract should be dismissed on the basis of the Eleventh Amendment. "Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has been interpreted also to bar federal suits against state governments by a state's own citizens." *Woods v. Rondout Valley Centr. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006). As the Supreme Court has taught, "federal courts may hear claims for prospective injunctive relief [against state officials], but retroactive claims seeking monetary damages from the state treasury are barred by the Eleventh Amendment because, even if state officials are the nominal defendants, the state is the real party in interest." *Tsirelman v. Daines*, 794 F.3d 310, 314 (2d Cir. 2015) (citing *Edelman v. Jordan*, 415 U.S. 651, 663, 677 (1974)).

Plaintiffs' breach-of-contract claim appears to seek monetary damages from state officials, who acted in their official capacities when they reduced the State's contribution rates to retirees' NYSHIP premiums. In the district court, Defendants sought the dismissal of Plaintiffs' action on Eleventh Amendment grounds, and the district court partially granted Defendants' motion, including "[t]o the extent plaintiffs seek monetary relief against defendants acting in their official capacity as agents of the State." J. App'x 505-06. Nonetheless, for reasons

## IV.    Contractual Impairment

Article I, § 10 of the U.S. Constitution provides, in part, that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." Plaintiffs argue that the State's reduction of its contribution rates to retirees' NYSHIP coverage costs, from 90% to 88% for individual coverage and from 75% to 73% for dependent coverage, impaired the State's alleged contractual obligation to

that are not entirely clear from the record before us, Plaintiffs' breach-of-contract claim survived the motion to dismiss and was later dismissed by the district court, on the merits, at the summary-judgment stage. On appeal, Defendants argue only that the claim was properly dismissed on the merits, without reference to the Eleventh Amendment.

The Eleventh Amendment "does not automatically destroy original jurisdiction," but rather "grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense" and a court need not "raise the defect on its own." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) (citations omitted). "Unless the State raises the matter, a court can ignore it." *Id.* (citation omitted). Moreover, this Court has previously declined to address Eleventh Amendment issues, even where the issue *was* raised by a state defendant, so as to avoid unnecessarily taking up a difficult constitutional issue. *See, e.g., Nat'l R.R. Passenger Corp. v. McDonald*, 779 F.3d 97, 100 (2d Cir. 2015); *Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 431 (2d Cir. 2004); *Tyler v. Douglas*, 280 F.3d 116, 121 (2d Cir. 2001). Here, by certifying to the New York Court of Appeals two questions that are critical to the resolution of Plaintiffs' state-law claim (as well as to their federal constitutional claim), we may avoid the unnecessary adjudication of a constitutional issue not raised by the Defendants on appeal. Accordingly, we decline to consider whether the Eleventh Amendment bars Plaintiffs' breach-of-contract claim.

51

contribute to the retirees' health insurance costs at fixed rates of 90% and 75% perpetually, in violation of that constitutional provision. Defendants contend that no such contractual obligation exists under the CBAs and that, even if it does exist, the State's reduction of its contribution rates did not amount to an unconstitutional impairment of its obligation.

In evaluating claims for contractual impairment, "we first ask whether the change in state law has operated as a substantial impairment of a contractual relationship." *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (citations and internal quotation marks omitted). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Id*. But "state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim." *Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (citation omitted). "[T]he interdiction of statutes impairing the obligations of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) (internal quotation marks and citation omitted). Even when a state law

52

substantially impairs a contractual obligation, it does not "trench[] impermissibly on contract rights" if it serves a "legitimate public purpose" through means that are "reasonable and necessary." *Buffalo Teachers*, 464 F.3d at 368.

Thus, to establish a violation of the Contract Clause, Plaintiffs must establish: (1) the existence of the alleged contractual obligation; (2) the State's impairment of that obligation; (3) the substantiality of that impairment; and (4) that the impairment was not a reasonable and necessary means of effectuating a legitimate public purpose. Although these elements are distinct from those of the state-law breach-of-contract claim, the validity of the federal constitutional claim in this case hinges in substantial part on the same undecided state-law questions that control the state-law claim.

**A. Contractual Obligation**

As explained above, when a federal court "is asked to invalidate a state statute upon the ground that it impairs the obligation of a contract, the existence of the contract and the nature and extent of its obligation become federal questions for the purposes of determining whether they are within the scope and meaning of the Federal Constitution." *Irving Trust Co.*, 314 U.S. at 561. While "we accord respectful consideration and great weight to the views of the state's

53

highest court . . . we are bound to decide for ourselves whether a contract was made, [and] what are its terms and conditions." *Brand*, 303 U.S. at 100. Where, as here, the "construction and effect" of a contract "is a state question," we "must determine it from the law of the state" but "give our own judgment derived from" state authority, "and not accept the present conclusion of the state court without inquiry." *Appleby*, 271 U.S. at 380.

In *Pineman*, we found that because existing state law did not resolve the issue at hand, "abstention [wa]s appropriate to afford the state courts an opportunity to adjudicate the contract law aspect of [the] claim, even though the federal courts, thereafter resolving the constitutional issue, will not be obliged to give the state court ruling the conclusive deference that abstention normally entails." *Pineman*, 637 F.2d at 605. Similarly, the Eighth Circuit affirmed a district court's decision to certify the question of whether a contractual obligation existed to the appropriate state court, because in doing so the district court "gave proper consideration to the state court's views but independently determined that the right to payment under the [statute] is not contractual within the meaning of the Contract Clause." *Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 552 (8th Cir. 1997).

We find, as discussed above, that New York law does not conclusively address the question of whether – and if so, when – a court should infer that a CBA that is silent as to the duration of retirees' health-insurance benefits nonetheless provides, either unambiguously or ambiguously, for a vested right to such benefits. The New York Court of Appeals in *Kolbe* expressly declined to "rule on whether New York applies an inference of vesting for retiree health insurance rights," 22 N.Y.3d at 354, while also finding that the relevant CBA language unambiguously established a vested right to coverage and was ambiguous as to whether the scope of such coverage included fixed co-pays, *id*. at 353, 355. More recently, the Second Department concluded that retiree health-insurance benefits unambiguously did not vest, absent express durational language relating to those benefits, *Old Brookville*, 117 N.Y.S.3d at 267, while the Third Department concluded that a CBA that was "silent as to the duration of retiree benefits" was nonetheless ambiguous as to whether such benefits vested, *Evans*, 123 N.Y.S.3d at 289 (quoting *Old Brookville*, 117 N.Y.S.3d at 267). Thus, the present state of New York law on this question is not entirely clear.

Moreover, in addressing the federal question of whether the alleged contractual obligation exists, we do not anticipate that we will reach a different

55

conclusion than the one compelled by state law. If, under New York law, the CBAs are properly interpreted so as to provide only for non-vested contribution rates, we see no basis to conclude that the State is seeking to "evade the restraint" of the Contract Clause by rendering a valid arrangement unenforceable. *Pineman*, 637 F.2d at 604.[16] Nor, if under New York law the CBAs *do* provide for vested contribution rates, is such an obligation ineligible for constitutional protection: a state's bargained-for promise to provide vested health benefits to retirees does not offend the Constitution in any respect.

*Tackett* and *Reese* do not command otherwise, even in the event that New York law applies an inference in favor of vesting or ambiguity that differs from the holdings in those cases. Those cases "arose in a different context than the claims presented here" because they were "brought under ERISA, which governs the relationship and agreements between private employers and their employees but excludes public employers and employees, like plaintiffs here. *See* 29 U.S.C. § 1003(b)(1)." *Serafino v. City of Hamtramck*, 707 F. App'x 345, 352 (6th Cir. 2017).

---

[16] Indeed, if the New York Court of Appeals were to interpret the CBAs in this manner, its interpretation would be consistent with the Supreme Court's interpretation of similar CBAs subject to federal law. *See Tackett*, 574 U.S. at 442; *Reese*, 138 S. Ct. at 766.

*See Tackett*, 574 U.S. at 434; *Reese*, 138 S. Ct. at 764. Our obligation to analyze Contract Clause claims under the federal constitution does not require us to apply, in determining the contract that is alleged to have been impaired by state legislative action, every interpretive convention recognized by federal law in the interpretation of federal contracts. Therefore, while the proper interpretation of the CBAs under New York law will not control our resolution of the issue for purposes of Plaintiffs' Contract Clause claim, we see no basis to anticipate that we will reach a contrary conclusion in exercising our independent responsibilities.

The question whether, as a matter of state law, the CBAs in question provide for the vesting of the State's rates of contribution to the cost of retirees' health insurance may therefore be dispositive of both the federal constitutional claim and the state-law claim. If the CBAs do not provide for vesting, neither claim is viable. For this reason, as well as others explained below, we conclude that it is appropriate "to afford the state courts an opportunity to adjudicate the contract law aspect of appellees' claim, even though the federal courts, thereafter resolving the constitutional issue, will not be obliged to give the state court ruling the conclusive deference that [certification] normally entails." *Pineman*, 637 F.2d

at 605.

**B. Impairment**

Assuming, without deciding, that Plaintiffs can successfully establish that the CBAs provide for a vested right to coverage at fixed contribution rates, Plaintiffs must next establish that the State impaired its contractual obligation to pay such rates.[17] As explained above, the distinction between a contractual breach and a contractual impairment "depends on the availability of a remedy in damages in response to the state's . . . action." *E & E Hauling*, 613 F.2d at 679. "[T]he federal Circuit Courts, as well as the Supreme Court, have consistently viewed this distinction – between breach and the removal of any remedy for breach – as a line delineating whether a Contracts Clause claim might lie." *Nassau Cty.*, 959 F.3d at

---

[17] Curiously, Plaintiffs (as well as all plaintiffs in the tandem cases) and Defendants both neglect to address this element of Plaintiffs' Contract Clause claim in their briefs, and the district court's decision granting summary judgment to Defendants similarly omits any discussion of whether Plaintiffs can establish an impairment of the alleged obligation. In all cases, the argumentation skips directly from a discussion of whether the alleged contractual obligation exists to a discussion of whether, if it does exist, any impairment of it was substantial. We therefore emphasize that in order to prevail on a federal constitutional claim of contractual impairment, a plaintiff must affirmatively establish, *inter alia*, that the defendant State *impaired* its contractual obligation.

58

63.

Even if a state's action interferes with a party's performance of its contractual obligation, unless it also "preclude[s] a damage remedy the contract has been breached and the non-breaching party can be made whole. If this happens, there has been no law impairing the obligation of the contract." *E & E Hauling*, 613 F.2d at 679. This Court has therefore determined that a plaintiff's Contract Clause claim "will be mooted" if the plaintiff recovers damages in a concurrent state-law action for breach of contract, because its recovery of damages "will demonstrate that there has been no impairment, but only a breach." *TM Park Ave.*, 214 F.3d at 349. By contrast, when a state "passes a law and through enforcement of it prevents a[] party from fulfilling its obligation under the contract," the law may act "as a defense to a suit" for breach of contract and preclude a damages remedy, "unless it is clear the law is not to have that effect." *E & E Hauling*, 613 F.2d at 679.

As with the task of determining, for purposes of a Contract Clause analysis, whether a contract exists and sets forth the alleged obligation, "we accord respectful consideration and great weight to the views of the state's highest court but . . . are bound to decide for ourselves whether . . . the State has,

59

by later legislation, impaired its obligation." *Brand*, 303 U.S. at 100. But while the issue of impairment remains within federal courts' ultimate discretion, we are guided for all practical purposes by the necessarily state-law inquiry into the availability of damages for breach.

As explained above, New York law does not conclusively establish whether either the state legislature's amendment of Civil Service Law § 167(8) or the Civil Service Commission's amendment of § 73.3(b) of the regulations operated so as to repudiate contrary contractual obligations and thereby negated Plaintiffs' access to damages for breach under New York law. While neither the statute nor regulation, on its face, provides for such an effect, the legislature and Civil Service Commission arguably "prevent[ed] [the State] from fulfilling its obligation under the contract" by both passing and enforcing a law that unilaterally reduced the State's contribution rates to retirees' NYSHIP costs. *E & E Hauling*, 613 F.2d at 679. Whether this "use of law" prevents the State from fulfilling *both* its performance obligation and its alternative obligation to pay damages, or instead merely gives rise to the latter obligation by breaching the former one, is a question appropriate for certification to the New York Court of Appeals.

## C. Constitutionality

"Not all impairments of contractual obligations are unconstitutional." *Id*. at 681. "To determine if a law trenches impermissibly on contract rights, we pose three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary." *Buffalo Teachers*, 464 F.3d at 368. "If the impairment is insubstantial, or the law is a reasonable and necessary means to remedy a legitimate public purpose, the Contracts Clause is not violated." *Nassau Cty.*, 959 F.3d at 64. Thus, even if, *arguendo*, Plaintiffs establish both the existence and the impairment of the alleged contractual obligation, they may prevail on their Contract Clause claim only if they further establish that the impairment was unconstitutional, meaning that it was substantial and was not reasonable and necessary to a legitimate public purpose.

"The substantiality of an impairment depends upon the extent to which reasonable expectations under the contract have been disrupted. And the reasonableness of expectations depends, in part, on whether legislative action

61

was foreseeable." *Nassau Cty.*, 959 F.3d at 64 (internal quotation marks omitted). "Impairment is greatest where the challenged government legislation was wholly unexpected." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). In evaluating "the degree of impairment" we also consider "the extent to which the challenged provision provides for gradual applicability or grace periods." *Id.* (internal quotation marks omitted).

"Minimal alteration of contractual obligations may end the inquiry" at the stage of evaluating an impairment's substantiality, whereas "[s]evere impairment . . . will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Spannaus*, 438 U.S. at 245. If we conclude that the impairment was substantial, "the state must show a significant and legitimate public purpose behind the law." *Buffalo Teachers*, 464 F.3d at 368. Such a purpose is one "aimed at remedying an important general or social economic problem rather than providing a benefit to special interests." *Sanitation & Recycling Indus.*, 107 F.3d at 993 (internal quotation marks omitted). Courts, including this one, "have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest." *Buffalo Teachers*, 464 F.3d at 369; *see id.* at 368-69; *Nassau Cty.*, 959 F.3d at 65; *Barr v. City of White Plains*, 779 F. App'x 765, 767-68

62

(2d Cir. 2019); *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444-45 (1934).

"That a contract-impairing law has a legitimate public purpose does not mean there is no Contracts Clause violation. The impairment must also be one where the means chosen are reasonable and necessary to meet the stated legitimate public purpose." *Buffalo Teachers*, 464 F.3d at 369. If the state is not "itself [] a party to the contract, courts usually defer to a legislature's determination as to whether a particular law was reasonable and necessary." *Id*. If the state *is* a party, the degree of deference depends on whether there are "some indicia that the state impaired the contract out of its own self-interest." *Nassau Cty.*, 959 F.3d at 65 (internal quotation marks and citation omitted). The plaintiffs bear the burden of showing "sufficient evidence" of "indicia of self-serving, privately motivated, action" by the state, in order to establish that a less deferential review of "the reasonableness and necessity of the government's actions" is warranted. *Id*. at 66. "Ultimately, for an impairment to be reasonable and necessary under *less deference scrutiny*, it must be shown that the state did not (1) consider impairing the contracts on par with other policy alternatives or (2) impose a drastic impairment when an evident or more moderate course would

63

serve its purpose equally well, nor (3) act unreasonably in light of the surrounding circumstances." *Buffalo Teachers*, 464 F.3d at 371 (internal quotation marks, citation, and alterations omitted).

In our view, Plaintiffs can likely establish that the alleged impairment was substantial. Assuming (without deciding) that the alleged contractual obligation was a negotiated term of the CBAs, Plaintiffs reasonably expected the State to honor that term and could not have foreseen its reduction of its contribution rates to retirees' NYSHIP coverage costs. The contribution rates Plaintiffs argue they are entitled to under the CBAs had been constant for nearly thirty years and were codified in a state statute. *See* N.Y. Civ. Serv. Law § 167(1). Contrary to Defendants' argument, the State's repeated efforts to renegotiate its contribution rates through the collective-bargaining process did not put Plaintiffs on notice that the State might bypass that process and implement its desired changes unilaterally.[18] We are therefore inclined to find that the alleged impairment of the

---

[18] To the contrary, those efforts are part of the alleged extrinsic evidence cited by the Plaintiffs as suggesting that the State believed that the existing rates were vested aspects of prior CBAs that could only be altered by collective bargaining. We express no view as to the persuasiveness of this argument. Rather, we observe only that an effort to negotiate a consensual change in putatively contractual terms does not put State employees or retirees on notice that the State might adopt the same changes without consent.

alleged contractual obligation was "wholly unexpected" and therefore substantial. *See Sanitation & Recycling Indus.*, 107 F.3d at 993. The changes were also "substantial" in the more ordinary meaning of the term: while the additional premium payment required of the average retiree – $10.50 per month for individual coverage and $28.50 per month for dependent coverage NYSCOA J. App'x. 94] – is not a dramatic number, the cumulative additional cost, over years or even decades of retirement, cannot be seen as trivial in the context of the budgets of retired employees on fixed incomes.

We are also inclined to conclude that the State acted with a legitimate public purpose. Defendants credibly argue that, as a result of the severe financial crisis that began in 2007, the State in 2011 faced a very significant budget deficit, which it addressed through a wide-ranging array of spending cuts that included the reduction of its contribution rates to retirees' NYSHIP costs. Prior decisions of this Court make clear that where, as here, a state seeks to address financial problems arising from a "severe fiscal crisis," it acts with a legitimate public purpose. *Buffalo Teachers*, 464 F.3d at 368. Plaintiffs have "presented no evidence to undermine" Defendants' claim that the State faced a serious fiscal crisis, which it also sought to solve through "other draconian measures." *Nassau Cty.*, 959 F.3d

65

at 65. Although Plaintiffs argue that the State, in collective-bargaining negotiations, regularly claimed that the State was facing a fiscal crisis, there is no serious question that the period following the "Great Recession" was one of austerity and constraint across the entire economy. The fact that the State may have previously cried wolf at the bargaining table does not undermine the substantial evidence that on this occasion it was dealing with a genuine wolf.

We find the reasonableness and necessity of the State's action to be a closer question – and one that we decline to answer at this time. The Supreme Court has "urged the federal courts of appeals to use certification in order to avoid deciding constitutional questions unnecessarily or prematurely." *Tunick v. Safir*, 209 F.3d 67, 72 (2d Cir. 2000) (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997)). "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law," as Plaintiffs ask that we do here. *Arizonans*, 520 U.S. at 79. An inquiry – even a deferential one – into whether a state legislature's potential impairment of its own contracts violated the U.S. Constitution is a delicate matter for a federal court to undertake and risks second-guessing, with the security of hindsight, difficult choices made by the legislature under demanding circumstances. The

New York Court of Appeals' answers to our certified questions may allow us to resolve this case without determining the constitutionality of the alleged impairment, should the Court conclude either that there was no vested contractual right in the first place or, alternatively, that Plaintiffs may recover state-law damages for breach of any such right, thus precluding Plaintiffs from establishing impairment. It would therefore be premature and potentially unnecessary for us to decide at this time whether the State's reduction of its contribution rates to retirees' NYSHIP costs, if it *was* an impairment of a contractual obligation, was nonetheless a reasonable and necessary response to the fiscal crisis or whether, alternatively, it offended the Contract Clause of the federal constitution.

## IV.    Certification

"Although the parties did not request certification, we are empowered to seek certification nostra sponte." *CIT Bank N.A. v. Schiffman*, 948 F.3d 529, 537 (2d Cir. 2020). "We have long recognized the appropriateness of according to state courts the opportunity to decide significant issues of state law through the certification process." *Corsair Special Situations Fund, L.P. v. Pesiri*, 863 F.3d 176, 183 (2d Cir. 2017). The rules of the New York Court of Appeals provide that

"[w]henever it appears to . . . any United States Court of Appeals . . . that determinative questions of New York law are involved in a case pending before that court for which no controlling precedent of the [New York] Court of Appeals exists, the court may certify the dispositive questions of law to the [New York] Court of Appeals." 22 N.Y.C.R.R. § 500.27(a); *see also* 2d Cir. R. 27.2(a) ("If state law permits, the court may certify a question of state law to that state's highest court.").

We have explained our standard for exercising our discretion as follows:

> Our decision to certify questions to the Court of Appeals is discretionary, and when exercising that discretion we consider whether: (1) the New York Courts of Appeals has not squarely addressed an issue and other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it; (2) the statute's [or, in this case, CBA's] plain language does not indicate the answer; (3) a decision on the merits requires value judgments and important public policy choices that the New York Court of Appeals is better situated than we to make; and (4) the questions certified will control the outcome of the case.

*CIT Bank N.A.*, 948 F.3d at 537 (internal quotation marks omitted).

All four of these factors weigh in favor of certifying two questions in this case: (1) a question concerning under what circumstances, if any, New York law permits an inference of vested post-retirement benefits under a state-law CBA,

68

notwithstanding the absence of any express specification that those benefits extend beyond the term of the CBA, and (2) a question concerning whether, assuming that the CBAs at issue did grant a vested contractual right to such benefits, New York's statutory reduction of its contribution rates for retirees' health-insurance coverage costs negated any contrary contractual obligations, so as to preclude the possibility of a remedy for breach. We address the reasons for certifying each of these questions in turn.

### A. Inference of Vested Benefits for Retirees

First, the New York Court of Appeals "has not squarely addressed" this issue, and "other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it." *Id*. (internal quotation marks omitted). As explained above, the New York Court of Appeals in *Kolbe* expressly left open the question of "whether New York applies an inference of vesting for retiree health insurance rights," 22 N.Y.3d at 354, and applied interpretive principles that are arguably in tension with those subsequently endorsed by the Supreme Court of the United States in *Tackett*, 574 U.S. at 442, and *Reese*, 138 S. Ct. at 766. *See Kolbe*, 22 NY.3d at 353-55. The Court of Appeals has not revisited the issue of inferences of vesting for retiree health insurance benefits since *Kolbe*; nor has it had occasion

69

to consider *Tackett* and *Reese*. Decisions by intermediate New York appellate courts on the issue have not taken consistent positions on whether *Tackett* and *Reese* reflect New York law. *Compare Old Brookville*, 117 N.Y.S.3d at 267 *with Evans*, 123 N.Y.S.3d at 289-90. We are therefore unable to predict how the New York Court of Appeals would address the issue of vesting in this case.

Second, the CBAs' "plain language does not indicate the answer." *CIT Bank N.A.*, 948 F.3d at 537 (internal quotation marks omitted). The 2007-2011 CBA sets forth the State's rates of contributions in § 9.13, a provision that is silent as to the duration of the specified rates or their applicability to retirees. Depending on the interpretive principles embraced by New York law, that silence may foreclose any possibility of vesting; alternatively, various provisions of the relevant CBAs arguably contemplate a vested right to coverage, the scope of which could plausibly be interpreted to encompass fixed contribution rates. Thus, the plain language of the CBAs is susceptible to more than one plausible interpretation, depending on the interpretive principles that the Court of Appeals adopts.

Third, deciding this issue necessarily entails "value judgments and important public policy choices" that the New York Court of Appeals is best suited to make. *Id*. (internal quotation marks omitted). New York law alone gives

employees of the State, who are not covered under the NLRA, a right to bargain collectively. *See* N.Y. Civ. Serv. Law § 203; 29 U.S.C. § 152(2) (excepting "any State or political subdivision thereof" from definition of "employer" as used in NLRA). Thus, the CBAs between CSEA and the State are created under and governed by New York law. A judicial decision interpreting the CBAs is guaranteed to have a substantial financial impact on both retired State employees and the State: Plaintiffs represent a group of approximately 71,000 retirees and their dependents, and the relevant CBA provisions are similar to those in ten other actions brought by other public-sector unions and their retired members. The State estimates that the reduction of its contribution rates toward the NYSHIP costs of retirees who retired since January 1, 1983 has saved it approximately $30 million annually.

Moreover, even beyond the scope of the present dispute, the interpretive principles applied to determine whether retirees' benefits vest under CBAs with the State may affect other rights under existing contracts and will surely influence the way in which the State and unions negotiate future contracts. The interpretation of this state-law agreement is therefore likely to have a broad and substantial impact on both existing and future contracts between the State and

71

public-sector unions representing State employees. Under these circumstances, it seems clear that the New York Court of Appeals is better situated than we to weigh the policy considerations and make the value judgments that necessarily accompany the resolution of this issue.

Fourth, the resolution of this issue may well be dispositive of the case. If the New York Court of Appeals determines that New York law does not recognize an inference of vesting for retiree health benefits, Plaintiffs cannot prevail on their state-law cause of action, and almost certainly would not be able to establish a contractual obligation protected by the federal Constitution's Contract Clause. If the Court of Appeals instead finds that the CBA is ambiguous with respect to the vesting of fixed contribution rates, its subsequent decision on the question of remedy, as discussed below, will effectively foreclose one of Plaintiffs' two asserted bases for relief.

We therefore conclude that this issue is appropriate for certification for the New York Court of Appeals.

**B. Effect of State's Action on Contrary Contractual Obligations**

We also find that it is appropriate in this case to certify a second question to the New York Court of Appeals, which that Court need only address if it

concludes, in answering the first question that we certify, that the relevant CBAs are best interpreted under New York law as providing for vested contribution rates (or at least are ambiguous with respect to vesting such that the district court's grant of summary judgment for Defendants on this issue must be vacated). If the Court of Appeals so determines, we respectfully ask that it further determine whether the State's unilateral statutory and regulatory reduction of its contribution rates to retirees' NYSHIP costs invalidated any contrary contractual obligations and thereby precluded a damages remedy under state law.

First, this too is an issue which the Court of Appeals has not addressed, and which cannot be conclusively resolved by reference to decisions of the State's other courts. As far as we are aware, New York courts have not previously considered the question of whether state legislative or administrative action that contravenes a performance obligation of the State under its CBAs also precludes the courts, as a matter of state law, from providing a remedy for breach of that obligation.

Second, neither New York Civil Service Law § 167(8) nor § 73.3(b) of the New York Code of Rules and Regulations indicates, by its plain language, what effect the State's reduction of its contribution rates to retirees' NYSHIP coverage

73

costs has on any contrary contractual obligations held by the State.

Third, resolving the question of whether the actions of the State's legislature and Civil Service Commission invalidated obligations undertaken by the State's executive branch in a potentially unconstitutional manner requires the balancing of sensitive and important policy considerations. Addressing this question entails careful weighing of the relationships between the State's branches and the interrelated effects of their exercises of sovereign power. In light of those considerations, the New York Court of Appeals is much better situated than we to undertake such an analysis.

Fourth, and finally, the answer to this question will, for all practical purposes, be determinative of at least one and possibly both of Plaintiffs' claims. If the Court of Appeals determines that the reduction of the State's contribution rates precludes a state-law remedy for breach of contract, Plaintiffs cannot prevail on their state-law breach-of-contract claim, but we would consequently conclude that the State substantially impaired its obligation, thereby allowing Plaintiffs to proceed to the analysis of whether such impairment was constitutional. If, on the other hand, the Court of Appeals determines that Plaintiffs may recover damages for breach of the CBAs, Plaintiff may be able to prevail on their state-law claim,

74

so long as the alleged contractual obligation is found to exist,[19] but we would consequently conclude that they are unable to prevail on their Contract Clause claim. Thus, the manner in which the Court of Appeals resolves this question will effectively resolve either the breach-of-contract claim or the federal constitutional claim and will substantially inform the resolution of the other claim.

We therefore conclude that certification of this issue to the New York Court of Appeals is appropriate.

## CONCLUSION

For the reasons stated above, we reserve decision[20] and certify the

---

[19] It is possible that the New York Court of Appeals could conclude, in resolving the first certified question, that the CBA is ambiguous as to whether the alleged obligation exists, thereby giving rise to a remand of this case to the district court for consideration of the extrinsic evidence in order to resolve that ambiguity. Under those circumstances, if the district court were to conclude on remand that the extrinsic evidence does *not* support the existence of the alleged vested right to fixed contribution rates, Plaintiffs would not be able to prevail on their state-law cause of action even if the New York Court of Appeals were to conclude, in resolving the second certified question, that damages are available for breach of contract. Thus, the resolution of the second certified question is only necessarily determinative of one of Plaintiffs' two causes of action – whichever of the two it effectively forecloses.

[20] In addition to reserving decision on Plaintiffs' claims for contractual impairment and breach of contract, we also reserve decision on their additional challenges to the district court's admission of declarations by witnesses whose identities were allegedly not disclosed to Plaintiffs, as required by Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure. Those issues are not case-

following two questions to the New York Court of Appeals.

**Question 1:**

Under New York state law, and in light of *Kolbe v. Tibbetts*, 22 N.Y.3d 344 (2013), *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015), and *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761 (2018), do §§ 9.13 (setting forth contribution rates of 90% and 75%), 9.23(a) (concerning contribution rates for surviving dependents of deceased retirees), 9.24(a) (specifying that retirees may retain NYSHIP coverage in retirement), 9.24(b) (permitting retirees to use sick-leave credit to defray premium costs), and 9.25 (allowing for the indefinite delay or suspension of coverage or sick-leave credits) of the 2007-2011 collective bargaining agreement between the Civil Service Employees Association, Inc. and the Executive Branch of the State of New York ("the CBA"), singly or in combination, (1) create a vested right in retired employees to have the State's rates of contribution to health-insurance premiums remain unchanged during their lifetimes, notwithstanding the duration of the CBA, or (2) if they do not, create sufficient ambiguity on that issue to permit the consideration of extrinsic evidence as to whether they create such a vested right?

---

dispositive, and the resolution of the certified questions may render them moot.

**Question 2**

If the CBA, on its face, or as interpreted at trial upon consideration of extrinsic evidence, creates a vested right in retired employees to have the State's rates of contribution to health-insurance premiums remain unchanged during their lives, notwithstanding the duration of the CBA, does New York's statutory and regulatory reduction of its contribution rates for retirees' premiums negate such a vested right so as to preclude a remedy under state law for breach of contract?

"As is our practice, we do not intend to limit the scope of the Court of Appeals' analysis through the formulation of our question[s], and we invite the Court of Appeals to expand upon or alter th[ese] question[s] as it should deem appropriate." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 126 (2d Cir. 2011).

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of briefs, appendices, and the record filed in this case by the parties. This panel retains jurisdiction for purposes of resolving this appeal after the disposition of the certification by the New York Court of Appeals.

# CERTIFICATE

The foregoing is hereby certified to the New York Court of Appeals pursuant to 22 N.Y.C.R.R. § 500.27(a) and 2d Cir. R. 27.2(a), as ordered by the United States Court of Appeals for the Second Circuit.