# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 6
Danny Donohue, &c., et al.,
        Appellants,
    v.
Andrew M. Cuomo, &c., et al.,
        Respondents,
et al.,
        Defendants.

Eric E. Wilke, for appellants.
Frederick A. Brodie, for respondents.
New York State Public Employees Federation, AFL-CIO, United University Professions, Police Benevolent Association of the New York State Troopers, Inc., New York State Law Enforcement Officers Union, Council 82, AFSCME, AFL-CIO et al., Court Attorneys Association of the City of New York et al., New York State Police Investigators Association, Local 4 IUPA, AFL-CIO et al., amici curiae.

SINGAS, J.:

In *Kolbe v Tibbetts*, we left open whether a New York court should infer vesting of retiree health insurance rights when construing a collective bargaining agreement (CBA) (*see* 22 NY3d 344, 354 [2013]). The Supreme Court subsequently rejected such inferences

- 1 -

as incompatible with ordinary contract principles under federal law in *M&G Polymers USA, LLC v Tackett* (574 US 427 [2015]) and *CNH Industrial N.V. v Reese* (583 US —, 138 S Ct 761 [2018]), repudiating *International Union, United Auto., Aerospace, & Agric. Implement Workers of Am. (UAW) v Yard-Man, Inc.* (716 F2d 1476 [6th Cir 1983], *cert denied* 465 US 1007 [1984]) and its progeny. In response to questions certified to us by the United States Court of Appeals for the Second Circuit, we conclude that *Yard-Man*-type inferences favoring such vesting are likewise inconsistent with New York's established contract interpretation principles.

I.

Plaintiff Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO (CSEA) is the collective negotiating representative of the largest bargaining unit of New York State workers. Among others, CSEA represents workers employed in New York's Administrative Services Unit, Institutional Services Unit, Operational Services Unit, and Division of Military and Naval Affairs Unit. It also represents certain workers employed by the Unified Court System. CSEA's members and former members may obtain health insurance through the New York State Health Insurance Plan (NYSHIP), an optional health-benefit plan covering current and retired state employees and other public employees.

From NYSHIP's creation in the 1950s until 1983, the State paid 100% of both employees' and retirees' costs under the plan for individual coverage and 75% of their costs for dependent coverage, as required by statute. The State's contribution rate changed

in 1983 after CSEA and other unions representing state employees reached a memorandum of understating (MOU), reducing that rate for individual coverage from 100% to 90%. The MOU superseded contrary provisions in the 1982-1985 CBA between CSEA and the State. The legislature amended Civil Service Law § 167 (1) to codify the negotiated contribution rates for qualifying employees who retired after January 1, 1983, but the amendment did not change the State's contribution rates for qualifying employees who had retired before that date (*see* L 1983, ch 14, § 1).

CSEA and the State thereafter agreed to seven CBAs, spanning 1985 to 2011, each containing provisions continuing the contribution rates at 90% for individual coverage and 75% for dependent coverage. Given the questions certified to us by the Second Circuit, we turn to the 2007-2011 CBA's relevant provisions.[1]

Section 9.13 (a) of the 2007-2011 CBA set forth the contribution rates discussed above, providing that "[t]he State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse components provided under the Empire Plan." The section did not, however, expressly state the duration of the State's promise to contribute at those rates. Section 9.24 (a) said that "[e]mployees covered by

---

[1] The Second Circuit focused its discussion "on the text of the parties' 2007-2011 CBA" because the relevant prior CBAs "contain provisions that are identical or substantially similar to the provisions from the 2007-2011 CBA" (980 F3d 53, 72 n 11 [2d Cir 2020]).

[NYSHIP] have the right to retain health insurance after retirement upon completion of [10] years of service."

Section 9.23 (a) concerned contribution rates for surviving dependents of deceased retirees, stating:

> "The unremarried spouse and otherwise eligible dependent children of an employee, who retires after April 1, 1979, with [10] or more years of active State service and subsequently dies, shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage."

Sections 9.24 (b) and 9.25 pertained to procedures for using sick-leave credits to defray premium costs. Section 9.24 (b) stated: "An employee who is eligible to continue health insurance coverage upon retirement is entitled to a sick leave credit to be used to defray any employee contribution toward the cost of the premium" and allowed employees to apply specified percentages "of the calculated basic monthly value of the credit towards defraying the required contribution to the monthly premium during their own lifetime." Section 9.25 said: "An employee retiring from State service may delay commencement or suspend his/her retiree health coverage and the use of the employee's sick leave conversion credits indefinitely."

The 2007-2011 CBA's article 50 contained a merger clause, stating that the CBA was "the entire agreement between the State and CSEA, terminate[d] all prior agreements and understandings and conclude[d] all collective negotiations during its term." Finally,

article 53 contained a four-year durational clause, providing that the CBA's term "shall be from April 2, 2007 to April 1, 2011."

As the 2007-2011 CBA neared its termination date, the State faced continued fiscal distress stemming from the Great Recession, including a $10 billion budget shortfall for fiscal year 2011-2012. In the context of that dire financial situation, CSEA and the State agreed to a five-year CBA in June 2011 under which the State's NYSHIP premium contribution rates for employees represented by CSEA were reduced by various percentages, depending on the employee's salary grade. Section 9.14 (a) of the 2011-2016 CBA stated that, effective October 1, 2011, the State agreed to pay 88% of individual coverage and 73% of dependent coverage for employees in a title salary grade 9 or below and 84% of individual coverage and 69% of dependent coverage for employees in a title salary grade 10 or above.

The legislature amended Civil Service Law § 167 (8) to provide that "the state cost of premium or subscription charges for eligible employees covered by such agreement may be modified pursuant to the terms of such agreement" (L 2011, ch 491, § 2; *see* Civil Service Law § 167 [8]). The amended statute also stated that the Civil Service Commission President, with approval from the Budget Director, "may extend the modified state cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision" (L 2011, ch 491, § 2; *see* Civil Service Law § 167 [8]). The Department of Civil Service thereafter amended its regulations to extend the modified contribution rates

to certain retirees. Specifically, the amended regulation states: "for retirees who retired on or after January 1, 1983, and employees retiring prior to January 1, 2012, New York State shall contribute 88 percent of the charge on account of individual coverage and 73 percent of the charge on account of dependent coverage" (4 NYCRR 73.3 [b] [1]).

## II.

After the State implemented the reduced NYSHIP contribution rates for the affected retirees in October 2011, CSEA, along with its president and certain retirees who were formerly in CSEA bargaining units (collectively, CSEA), commenced this action in federal court against, among others, certain New York State officials (collectively, the State).[2] CSEA asserted, among other claims, that the State breached the CBAs in effect at the time of the retirees' retirements and violated the United States Constitution's Contract Clause (*see* US Const, art I, § 10, cl 1). Other unions and retirees filed 10 related actions.

The United States District Court for the Northern District of New York, as relevant here, granted the State's summary judgment motions in all 11 actions and denied CSEA's motion for summary judgment (*see* 347 F Supp 3d 110, 146 [ND NY 2018]). The court concluded that "the unambiguous terms of the CBAs at issue did not create a vested interest in the perpetual continuation of premium contribution rates at a specific level" (*id.* at 129). The court determined that "the premium contribution rates are subject to the general

---

[2] CSEA originally brought suit against the State of New York, the Governor, the Civil Service Department and its Acting Commissioner, the Civil Service Commission and its Commissioners, the Budget Director, the Comptroller, the New York State and Local Retirement System, and the Unified Court System and its Chief Judge.

durational clauses and that [the] obligation ceased upon the termination of each respective CBA" (*id.* at 131). Because the retirees had no vested rights to a specified premium contribution rate, CSEA's breach of contract and Contract Clause claims failed as a matter of law.

The Second Circuit reserved decision on the 11 appeals and certified two questions to this Court (*see* 980 F3d at 87-88).[3] The first question concerns "under what circumstances, if any, New York law permits an inference of vested post-retirement benefits under a state-law CBA, notwithstanding the absence of any express specification that those benefits extend beyond the term of the CBA" (*id.* at 84). The court explained that in order to prevail on both the breach of contract and Contract Clause claims, CSEA "must establish that the relevant CBAs provide for a vested right to health-insurance coverage at fixed contribution rates for the life of the retiree" (*id.* at 59). The court concluded that "the CBAs do not *expressly* provide for a vested right to coverage at fixed contribution rates" and, thus, CSEA's "suggested interpretation of the CBAs is tenable only if a vested right—or, at minimum, ambiguity with respect to such a right, as is necessary for the consideration of extrinsic evidence of the meaning of the CBAs—may be inferred under the circumstances" (*id.*; *see id.* at 63).

---

[3] The certified questions pertain only to CSEA's action, which has been treated as the lead case throughout the litigation. The Second Circuit concluded that our resolution of the state law questions at issue here would allow it to decide the 10 other actions (*see* 980 F3d at 64 n 6).

The Second Circuit highlighted that, in *Kolbe*, this Court "previously declined to either adopt or reject an inference that retirees' health benefits vest under CBAs in the absence of express vesting language" (*id.* at 63, citing *Kolbe*, 22 NY3d at 354-355). The Circuit Court also explained that we had not addressed the impact of the Supreme Court's subsequent decisions in *Tackett* and *Reese*, which concern vesting of rights pursuant to CBAs under federal law, and concluded that the Second and Third Departments "have taken divergent approaches to applying" those holdings (*id.* at 71). The Second Circuit therefore could not "confidently predict" whether we would "adopt the holdings of *Tackett* and *Reese*" (*id.* at 72; *see id.* at 75).

"Assuming, without deciding," that CSEA could "successfully establish that the CBAs provide for a vested right to fixed contribution rates" (*id.* at 75), the Second Circuit turned to whether the alleged resulting harm was "a remediable breach" of the CBA or "an irremediable repudiation" of the CBA's "contrary obligations" (*id.* at 77). The court determined that an open question existed concerning "whether the State's unilateral statutory and regulatory reduction of its contribution rates to retirees' NYSHIP costs invalidated any contrary contractual obligations and thereby precluded a damages remedy under state law" (*id.* at 86).

The Second Circuit therefore certified the following two questions:

> "Under New York state law, and in light of *Kolbe v. Tibbetts*,
> 22 N.Y.3d 344, 980 N.Y.S.2d 903, 3 N.E.3d 1151 (2013), *M
> & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 135 S.Ct.
> 926, 190 L.Ed.2d 809 (2015), and *CNH Indus. N.V. v. Reese*,
> — U.S. —, 138 S.Ct. 761, 200 L.Ed.2d 1 (2018), do §§ 9.13

(setting forth contribution rates of 90% and 75%), 9.23(a) (concerning contribution rates for surviving dependents of deceased retirees), 9.24(a) (specifying that retirees may retain NYSHIP coverage in retirement), 9.24(b) (permitting retirees to use sick-leave credit to defray premium costs), and 9.25 (allowing for the indefinite delay or suspension of coverage or sick-leave credits) of the 2007-2011 collective bargaining agreement between the Civil Service Employees Association, Inc. and the Executive Branch of the State of New York ("the CBA"), singly or in combination, (1) create a vested right in retired employees to have the State's rates of contribution to health-insurance premiums remain unchanged during their lifetimes, notwithstanding the duration of the CBA, or (2) if they do not, create sufficient ambiguity on that issue to permit the consideration of extrinsic evidence as to whether they create such a vested right? . . .

"If the CBA, on its face, or as interpreted at trial upon consideration of extrinsic evidence, creates a vested right in retired employees to have the State's rates of contribution to health-insurance premiums remain unchanged during their lives, notwithstanding the duration of the CBA, does New York's statutory and regulatory reduction of its contribution rates for retirees' premiums negate such a vested right so as to preclude a remedy under state law for breach of contract?"

(*id.* at 87-88).  We accepted the questions (*see* 36 NY3d 935 [2020]).

III.

A.

In New York, our general contract interpretation principles are well established. "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent" and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing" (*Greenfield v Philles Records*,

98 NY2d 562, 569 [2002] [internal quotation marks and citation omitted]). "[W]here a contract was negotiated between sophisticated, counseled business people negotiating at arm's length, courts should be especially reluctant to interpret an agreement as impliedly stating something which the parties" specifically did not include (*2138747 Ontario, Inc. v Samsung C&T Corp.*, 31 NY3d 372, 381 [2018] [internal quotation marks and citation omitted]).

"Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]). Extrinsic or parol evidence "is admissible only if a court finds an ambiguity in the contract" (*Schron v Troutman Sanders LLP*, 20 NY3d 430, 436 [2013]; *see Greenfield*, 98 NY2d at 569); such evidence "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face" (*W.W.W. Assoc.*, 77 NY2d at 163 [internal quotation marks and citation omitted]). A contract's silence on an issue does not "create an ambiguity which opens the door to the admissibility of extrinsic evidence to determine the intent of the parties" (*Greenfield*, 98 NY2d at 570). More to the point, "'an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful'" (*id.* at 573, quoting *Trustees of Southampton v Jessup*, 173 NY 84, 90 [1903]). Determining whether a contract is ambiguous "is an issue of law for the courts to decide" (*id.* at 569). Under our established standards, "[a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by

danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" (*id.* [internal quotation marks and citation omitted]). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations" (*Ellington v EMI Music, Inc.*, 24 NY3d 239, 244 [2014] [internal quotation marks and citations omitted]). Consistent with New York law, "'[a] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms'" (*Kolbe*, 22 NY3d at 353, quoting *Greenfield*, 98 NY2d at 569).

## B.

We applied our settled contract principles in *Kolbe*, where the plaintiffs were four former employees of a school district who retired between 2003 and 2008. During their employment, the plaintiffs were members of a collective bargaining unit represented by CSEA. In 2010, after the plaintiffs had retired, CSEA and the school district agreed to a successor CBA, which continued verbatim certain provisions regarding retiree health insurance benefits. One section provided that "'[r]etired employees shall be eligible to continue group health insurance upon [timely] payment of premium'" (*id.* at 350). Another section, section 6.5.3, provided that full-time employees who retired from the school district under a stated plan "'shall be entitled to receive credit toward group health insurance premiums (including District contribution toward Flexible spending account) for accumulated sick leave'" (*id.*). "The premium credit was to be calculated as a percentage

according to a formula and to be paid by the District 'until the employee reaches age 70'" (*id.*). "The same provision contained the sentence that gave rise to the . . . litigation, '[t]he coverage provided shall be the coverage which is in effect for the unit at such time as the employee retires'" (*id.*).

When the plaintiffs retired, the relevant CBAs contained certain provisions with respect to co-pays for prescription drugs and flexible spending for health care expenses. The 2010 successor CBA made changes to those two benefits; the co-pays were increased, as were the limits for flexible spending. After the school district informed the plaintiffs that their co-pays and flexible spending benefits would be governed by the successor CBA's terms, the plaintiffs commenced the breach of contract action alleging that the school district "violated the terms of the CBAs in effect when [the] plaintiffs retired" by increasing their co-pays (*id.* at 351). On appeal to this Court, the relevant issues were whether the CBAs gave plaintiffs "a vested right to the same health insurance coverage they had when they retired and, if so, whether unilateral modifications to that coverage [were] nonetheless permissible under . . . the contract terms" (*id.* at 348-349).

In addressing those issues, we explained that, "[a]s a general rule, contractual rights and obligations do not survive beyond the termination of a [CBA]" (*id.* at 353, citing *Litton Financial Printing Div., Litton Business Systems, Inc. v NLRB*, 501 US 190, 207 [1991]). Still, "'[r]ights which accrued or vested under the agreement will'" generally "'survive termination of the agreement'" (*id.*, quoting *Litton* 501 US at 207). We made clear that a

court "must look to well established principles of contract interpretation to determine whether the parties intended that the contract give rise to a vested right" (*id.*).

Applying those principles, we held that the plain meaning of section 6.5.3 "unambiguously establishe[d]" that the plaintiffs had "a vested right to the 'coverage which [was] in effect for the unit at such time as [they] retire[d],' until they reach[ed] age 70" (*id.*). Because the CBA was "clear on its face," we declined "to rule on whether New York applies an inference of vesting for retiree health insurance rights" (*id.* at 354), while citing *Yard-Man*.

We proceeded to the "crux of the parties' disagreement," which was "not the existence but the scope of the vested right" contained in section 6.5.3 (22 NY3d at 354). We concluded that "the operative provision in section 6.5.3" was ambiguous, "making it appropriate . . . to consider extrinsic evidence" (*id.* at 355, citing *W.W.W. Assoc.*, 77 NY2d at 162). Because the "evidence submitted on summary judgment" did not "resolve the ambiguity," we remitted the case for a hearing to decide that issue of fact (*id.*).

As noted, in *Kolbe*, we left open the question whether "New York applies an inference of vesting for retiree health insurance rights" (*id.* at 354), and cited *Yard-Man*. In *Yard-Man*, the CBA between the union and the employer, Yard-Man, Incorporated, stated that when a former employee reached 65 years of age, Yard-Man would "provide insurance benefits equal to the active group benefits . . . for the former employee and [their] spouse" (716 F2d at 1480 [emphasis omitted]). When Yard-Man notified retirees that it planned to terminate their health and life insurance benefits upon the expiration of the

CBA, the retirees commenced an action claiming that the CBA provided lifelong insurance benefits. The Sixth Circuit agreed, holding that "the parties intended to create nonterminating lifelong insurance benefits for the Yard-Man retirees" (*id.*).

Finding the CBA provision ambiguous, the court "look[ed] to other provisions of the [CBA] for evidence of intent and an interpretation which [was] harmonious with the entire document" (*id.*). First, the court concluded that it was "improbable that retiree benefits were intended to depend in duration upon the fortunes of the active employees" (*id.* at 1481). Second, because "the insurance provisions limit[ed] health insurance coverage for a retiree's spouse and dependent children in case of the retiree's death to expiration of the" CBA, it was "more reasonable to infer that the spouse-dependent child provision was meant as an exception to the anticipated continuation of benefits beyond the life of the" CBA (*id.*). Third, terminating retiree benefits at the end of the CBA could render the insurance provisions "completely illusory for many early retirees under age 62" (*id.*). "Fourth, the inclusion of specific durational limitations in other provisions of the" CBA "suggest[ed] that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship" (*id.* at 1481-1482). "Finally, . . . the context in which these benefits arose demonstrate[d] the likelihood that continuing insurance benefits for retirees were intended" because retiree benefits "are only permissive not mandatory subjects of collective bargaining" (*id.* at 1482). Thus, "it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to

the contingencies of future negotiations" (*id.*). The court further explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained" (*id.*). The court determined that these "persuasive considerations . . . demonstrate[d] that retiree benefits were intended to outlive the" CBA's "life and outweigh any contrary implications derived from a routine duration clause terminating the agreement generally" (*id.* at 1482-1483). Indeed, "[s]uch an intent takes precedence over a non-specific, general clause" (*id.* at 1483).

The Supreme Court repudiated *Yard-Man*, holding, in *Tackett*, that *Yard-Man* "is incompatible with ordinary principles of contract law" (574 US at 430). In *Tackett*, retirees and their former union claimed that expired CBAs "created a right to lifetime contribution-free health care benefits for retirees, their surviving spouses, and their dependents" (*id.*). The employer maintained that the health care provisions terminated when the CBAs expired and, thus, "announced that it would begin requiring retirees to contribute to the cost of their health care benefits" (*id.* at 432). The Sixth Circuit, relying on *Yard-Man*, "sided with the retirees," concluding that "retiree health care benefits are unlikely to be left up to future negotiations" (*id.* at 430). The Supreme Court vacated the judgment and remanded to the Sixth Circuit "to apply ordinary principles of contract law" (*id.*).

The Supreme Court explained that it interprets CBAs "according to ordinary principles of contract law" and disagreed with the Sixth Circuit's "assessment that the inferences applied in *Yard-Man* and its progeny represent" such principles (*id.* at 435, 438). Instead, "*Yard-Man* violates ordinary contract principles by placing a thumb on the scale in

favor of vested retiree benefits in all" CBAs and "distorts the attempt to ascertain the intention of the parties" (*id.* at 438 [internal quotation marks, citation, and emphasis omitted]). The Supreme Court further criticized *Yard-Man* for refusing "to apply general durational clauses to provisions governing retiree benefits," thereby "distort[ing] the text of the agreement and conflict[ing] with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties" (*id.* at 440).

Three years later, in *Reese*, the Supreme Court extended its *Tackett* holding. After reiterating that the *Yard-Man* inferences are not ordinary principles of contract law, the Court rejected the Sixth Circuit's analysis that used those inferences to render a CBA ambiguous (*see* 583 US at —, 138 S Ct at 763). The Court explained that the discredited inferences the Sixth Circuit formerly used to presume lifetime vesting likewise were inappropriate considerations when analyzing whether ambiguity existed concerning that issue. In other words, the inferences "cannot be used to create a reasonable interpretation any more than they can be used to create a presumptive one" (583 US at —, 138 S Ct at 6).

As the Second Circuit noted, we have not expressly adopted or rejected *Yard-Man*-type inferences, nor addressed the impact of *Tackett* and *Reese* on New York law. Notably, he Appellate Division has been inconsistent in its handling of *Tackett* and *Reese*.[4] In responding to the Second Circuit's questions, we resolve these questions of New York law.

---

[4] Compare *Village of Old Brookville v Village of Muttontown* (179 AD3d 972, 975 [2d Dept 2020] [rejecting *Yard-Man*-type inferences and concluding that because the CBA was "silent as to the duration of the health benefits promised therein . . . , it must be

IV.

Initially, in accord with our established contract principles, we agree with the Second Circuit that the 2007-2011 CBA does "not *expressly* provide for a vested right to coverage at fixed contribution rates" (980 F3d at 59).  Settling the question left open in *Kolbe*, we decline to adopt any *Yard-Man*-type inferences, either in favor of vested rights or in favor of determining that ambiguity exists concerning that issue.  Such inferences conflict with this State's established contract law, which focuses on the parties' chosen language, by injecting considerations untethered to the words that the parties included in their agreement.

We foreshadowed this conclusion in *Kolbe*, where we said that "contractual rights and obligations" generally "do not survive beyond the termination" of a CBA (22 NY3d at 353).  We made clear that, in New York, courts should analyze whether a vested right exists under a CBA like any other contract question—using our well established principles of contract interpretation.  Inferences akin to those applied in *Yard-Man* are inconsistent with New York's ordinary contract principles because they "plac[e] a thumb on the scale in favor of vested retiree benefits" (*Tackett*, 574 US at 438).  Instead of adopting such

---

assumed that those benefits were promised only until the expiration of that agreement"]), with *Evans v Deposit Cent. Sch. Dist.* (183 AD3d 1081, 1083 [3d Dept 2020] [stating that the absence of durational language specific to retiree benefits renders it "logical to assume . . . that the bargaining unit intended to insulate retirees from losing important insurance rights during subsequent negotiations" (internal quotation marks and citation omitted)]), and *Guerrucci v School Dist. of City of Niagara Falls* (126 AD3d 1498, 1500 [4th Dept 2015] [same], *lv dismissed* 25 NY3d 1194 [2015]).

inferences based on policy considerations grounded in employment matters, or any other considerations, existing outside the four corners of the CBA, we adhere to our contract principles which preclude a New York court from "disregard[ing] the precise terminology that the parties used" (*Global Reins. Corp. of Am. v Century Indem. Co.*, 30 NY3d 508, 519 [2017]).  This rule conforms to our precedent, thereby promoting our commitment to "impart[] stability to commercial transactions" in this State (*W.W.W. Assoc.*, 77 NY2d at 162 [internal quotation marks and citation omitted]).

Moreover, *Kolbe* did not implicitly adopt any inferences favoring vesting that we explicitly declined to rule on therein.  Although we drew an "inference . . . that the parties intended the right to continued coverage to operate for the same period as the section as a whole," this inference stemmed from New York's ordinary contract principles—namely, the "well established" interpretation rule that "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby" (22 NY3d at 353 [internal quotation marks and citation omitted]).  Applying that construction rule, not *Yard-Man*-type inferences, we held that the CBA was "clear on its face" and "unambiguously establishe[d]" that the plaintiffs had a vested right to the coverage they claimed (*id.* at 353, 354).

We maintain our traditional contract interpretation principles, including those set forth in *Kolbe*, but clarify that New York's contract law does not recognize *Yard-Man*-like inferences.  Absent such inferences, none of the CBA provisions identified by the Second

Circuit in the first certified question establish a vested right to lifetime fixed premium contributions, either singly or in combination.

Having resolved the issue we left open in *Kolbe*, we proceed no further and accept the Second Circuit's invitation to limit the questions as appropriate (*see* 980 F3d at 88). We believe that our analysis answers the pivotal question that prompted the Second Circuit's certification, and settles New York law that governs the first certified question. We act cautiously in this regard, cognizant of exceeding our role on certification by applying New York's now-established law to the facts presented in this federal action in the first instance. We therefore have no occasion to determine whether the CBA's text is ambiguous (*see Liriano v Hobart Corp.*, 92 NY2d 232, 243 [1998]). Because we conclude that the CBA does not expressly provide for vested contribution rates and do not answer whether the CBA is ambiguous on that issue, we likewise respectfully decline to address the second certified question.

Accordingly, the certified questions should be answered in accordance with this opinion.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified questions answered in accordance with the opinion herein. Opinion by Judge Singas. Judges Rivera, Garcia, Wilson and Cannataro concur. Chief Judge DiFiore and Judge Troutman took no part.

Decided February 10, 2022